```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3                      SOUTHERN DIVISION

 4   UNITED STATES OF AMERICA,      ) CRIMINAL
                                    ) NO. GJH-21-028
 5            Plaintiff,            )
                                    )
 6   v.                             )
                                    )
 7   ADEBOWALE OJO,                 )
                                    )
 8            Defendant.            )

 9         TRANSCRIPT OF JURY TRIAL PROCEEDINGS - DAY 8
              BEFORE THE HONORABLE GEORGE J. HAZEL,
10                UNITED STATES DISTRICT JUDGE,
                          AND A JURY
11            THURSDAY, MARCH 17, 2022; 9:38 A.M.
                       GREENBELT, MARYLAND
12
     FOR THE PLAINTIFF:
13
                 OFFICE OF THE UNITED STATES ATTORNEY
14               BY:  JESSICA C. COLLINS, ESQUIRE
                 BY:  KELLY O'CONNELL HAYES, ESQUIRE
15               6406 Ivy Lane
                 Suite 800
16               Greenbelt, Maryland  20770
                 (301) 344-0179
17
     FOR THE DEFENDANT (Standby Counsel):
18
                 LAW OFFICE OF MARC G. HALL, P.C.
19               BY:  MARC G. HALL, ESQUIRE
                 7474 Greenway Center Drive
20               Suite 150
                 Greenbelt, Maryland  20770
21               (240) 205-3041
                     -AND-
22               ADEBOWALE OJO, Pro Se

23   OFFICIAL COURT REPORTER:
     Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227
24
       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
25
```

1          (Call to order of the Court.)

2              THE COURT:  Good morning, everyone.  Everyone can be

3    seated.

4          I have updated copies of the verdict form and the jury

5    instructions.  On the verdict form, all I did -- I added the

6    dates to the specific charges just to make it easier for the

7    jury to track that, and I have copies of that and the current

8    version of the jury instructions.  If I can get a volunteer to

9    come grab them.  Any counsel.  I will put my mask back on as

10   you do that.  If you can share one with the other side.

11         There -- we are still working on the Table of Contents

12   and some paging issues, so before it goes back to the jury, we

13   will correct all that, but it's -- it's substantively what we

14   landed on yesterday.

15         But the other thing I wanted to do before we go any

16   further is do a formal inquiry related to the defendant's

17   decision to testify or not to testify.

18         I assume you have not changed your mind on that?

19              MR. OJO:  No, I haven't.  I haven't changed my mind.

20              THE COURT:  All right.  So there is just -- so we

21   have discussed that informally.  There is a formal process we

22   need to go through, and I will do that now.

23         So I need to advise you that you have a right to testify

24   in this case if you wish to, that you can take the stand, you

25   can, in this case, either ask yourself questions or have

1    Mr. Hall ask you questions.  You would answer those questions.

2         Then when you are done, the government would have the

3    opportunity to cross-examine you.  As part of their

4    cross-examination, they might ask you questions about prior

5    convictions that you have if they are -- if they exist and are

6    appropriate for impeachment purposes.  I don't know much about

7    your criminal history as I sit here.  You made reference to a

8    career offender issue, so that tells me there is something

9    there, and they might be able to ask you about that.

10        But I do want you to understand you have an absolute

11   right to testify.  No one can stop you from testifying from the

12   witness stand under oath if you wish to.  Not your attorney,

13   not the government, nor I could prevent you from doing that if

14   that's what you want to do.

15        Do you understand you have a right to testify?

16            MR. OJO:  Yes, I do.

17            THE COURT:  I also want to make sure you understand

18   that you also have a right not to testify, that no one can

19   force you to testify in this case.  The government can't call

20   you to the witness stand.  Your attorney can't force you to

21   testify.  Even I, as the Court, could not order you to take the

22   stand and testify in this case.  You have an absolute right not

23   to testify.  That's your decision.  And I will instruct the

24   jury, if that's your choice, not to give any consideration to

25   the fact that you didn't testify.

1              Do you understand your right not to testify?

2              MR. OJO:  Yes, Your Honor.

3              THE COURT:  All right.  Now, usually I would ask if

4    you had discussed the decision with your attorney.  I will ask

5    if you have discussed the decision with your standby attorney?

6              MR. OJO:  Somewhat prior to -- to recently.

7              THE COURT:  Okay.

8              MR. OJO:  The only --

9              THE COURT:  Ultimately, you are acting as your own

10   attorney here, so really I will just ask you:  Have you given

11   thought to whether or not you want to testify?

12             MR. OJO:  I was told kind of that I would be

13   impeached because of my record, so I didn't really see any

14   point -- I thought it was just going to go out the window.

15   There was evidence of my work and that I needed --

16             THE COURT:  So let me say you don't have to share

17   with me your reasons for your decision.  What you have

18   expressed is consistent with what I just said, that if you take

19   the stand -- whoever said that to you is not inaccurate -- if

20   you take the stand, the government would be able to impeach you

21   with your prior convictions.  I am not making -- stating any

22   opinion on what the impact of that would be or what you should

23   do.  But it is true, as I just advised you, if you take the

24   stand, they can impeach you with your convictions.

25             That said, I don't -- I don't need to know the reasoning

1    for your decision.  All I want -- and I am not going to advise

2    you on your decision.  I just want to know if you have given it

3    thought?

4            MR. OJO:  May I state a relative fact about -- just

5    because --

6            THE COURT:  Sure.

7            MR. OJO:  I couldn't get the evidence myself.  Was --

8    I was trying to get evidence of my work, from my job to show

9    where I was during the time period.  I gave him the name of the

10   company and the location so I can show where my movements were

11   during that time period, and that's relevant because those are

12   the time periods where I was alleged to be in certain

13   locations, but I am not sure --

14           THE COURT:  That's a separate issue.  That's a

15   separate issue.  I am asking you:  Have you given thought to

16   your decision whether or not you want to testify?

17           MR. OJO:  That was part of my thought in not

18   testifying.

19           THE COURT:  It's a yes or no.  Are you -- have you

20   given thought to your decision whether or not you are going to

21   testify?

22           MR. OJO:  Yes.

23           THE COURT:  Okay.  What is your decision?  I don't

24   need to know the reason for your decision.  I just need to know

25   your decision.

1          MR. OJO:  I understand you don't need to know the

2    reason, but you didn't say that I couldn't explain.

3          THE COURT:  Okay.  Well, now you have.  I need you to

4    answer my question, though.

5          MR. OJO:  I am not testifying.

6          THE COURT:  Thank you.  Thank you.  All right.

7       Is Ms. Billeter here?  I don't know which side to look to

8    for that information.

9          MR. HALL:  My understanding is she is.  I have not

10   personally seen her, but I think the government has.  There is

11   an issue that I believe Mr. Ojo wants to bring up concerning

12   her.

13         MR. OJO:  I was told that --

14         THE COURT:  Let me say if you are choosing to keep

15   your mask on, you can, but --

16         MR. OJO:  I was told that I couldn't ask Ms. Billeter

17   that -- why she wasn't -- or why she's no longer an agent, that

18   she was going to plead the Fifth.  This was brought to my

19   attention this morning.

20         THE COURT:  Okay.

21         MR. OJO:  So I was also asking why the government was

22   speaking to Ms. Billeter this morning prior to her examination.

23   I understand that may be an issue if she wanted to discuss that

24   topic with them.

25         THE COURT:  Let me say first, there wouldn't really

1    be an issue with the government talking to her if she wanted to

2    have the conversation.  Like, I assume they -- I don't want to

3    make any assumptions.  There is nothing wrong with the

4    government contacting her between last night and today, so if

5    that happened, that happened.  There is no issue with that.

6         If -- and either side -- I don't know if I am being

7    advised of this -- if she's planning to take the Fifth, then we

8    would need to question her about that outside the presence of

9    the jury.

10         MS. HAYES:  Yes, Your Honor.  So my understanding is

11    -- let me explain.  As we explained to Mr. Hall, there would be

12    -- my understanding is there would be no concern with

13    explaining the fact that she was terminated as a source, that

14    in and of itself.  It was more if he then continued to go into

15    conduct, the specific conduct that resulted in that

16    termination.

17         At this point, she hasn't been charged.  There is no --

18    if she has a valid, in my opinion, of course -- and so she has

19    indicated to us freely, without our prompting, that she would

20    answer by pleading the Fifth, so we wanted to bring that to

21    Mr. Hall's attention; we brought it to Mr. Ojo's attention.

22         It is separate from I think how Mr. Ojo just explained

23    it.  There is not a concern with asking about the termination

24    as a source in and of itself.  It's more the conduct related to

25    any of the criminal activity.  So yes, Your Honor, that is our

1  understanding, that Ms. Billeter will, in fact, plead the Fifth

2  if asked those types of questions.

3          THE COURT:  Does she have an attorney?

4          MS. HAYES:  Not that I am aware of, Your Honor.

5          THE COURT:  All right.  So I will say my instinct is

6  to say that would be a legitimate invocation of the Fifth.  If

7  you were to ask her details regarding criminal conduct that's

8  still outstanding, I will say -- and this is -- I am really

9  trying hard to avoid giving advice to either side; sometimes I

10 probably talk too much; you can talk to your attorney about

11 this -- whether her invocation of the Fifth accomplishes

12 whatever it is you are trying to get out of the situation.

13      But that would be -- I mean, I could bring her in here

14 and question her about it, but even just based on that proffer,

15 based on what has been told to me, it seems pretty clear that

16 that would be a legitimate basis to invoke her Fifth Amendment

17 privilege.

18          MR. OJO:  I just, you know --

19          THE COURT:  Let me just finish the thought.  I

20 apologize.  Let me finish the thought.  I would permit you to

21 ask the question and make her invoke the Fifth, and I don't

22 always do that.  In this situation, I would make her invoke the

23 Fifth on the stand in front of the jury and they would have

24 that information, but -- but I do think it would be an

25 appropriate invocation of the Fifth.

1          MR. OJO:  I just don't want to look as if I am --

2   there is going to be objections.  I don't think I am skilled

3   enough to weave -- we have clearly gone through that I am not

4   skilled enough to get some of the answers.

5          THE COURT:  I believe I warned you about that

6   multiple times weeks ago, so that's -- I am not sympathetic to

7   that at this point.  It's your choice what you want to do at

8   this point.

9      Do you still want to call her or not?

10          MR. OJO:  I am just going to ask her if she -- one

11  question.  If she invokes the Fifth, I am not going to do

12  anymore questions because everything I say is going to be

13  objected.

14          THE COURT:  Let me say this, though:  Is that the

15  only thing you are going to inquire about?

16          MR. OJO:  No.  It's not that that's the only thing --

17          MR. HALL:  That's the only thing that there is an

18  issue about.

19          MR. OJO:  I know, but questions about timelines, if

20  -- if it's encompassed by that, there is going to be a lot of

21  -- I am not answering.

22          THE COURT:  Yeah.  Again, I have probably done too

23  much if anything.  I guess I can say this, the government is

24  unlikely to appeal.  I have probably done too much if anything

25  to try to guide you in that way, so I am -- you can do with

1   that whatever you want.  All right?  It's your decision.

2        Do you want to call her or not?

3            MR. OJO:  Yes.  I am going to call her.

4            MS. HAYES:  Your Honor, we would object if the sole

5   purpose of him calling her is to ask her one question and her

6   to plead the Fifth.  Certainly if there is other questions, you

7   know, we are in a different ball game, but if that's the sole

8   purpose, to ask one question, we would object to that.

9            THE COURT:  I agree with that and that's why I asked

10  the follow-up question, and then Mr. Hall -- no criticism to

11  Mr. Hall -- seemed to have whispered something in his ear, and

12  then he changed his answer on that.

13       So I guess I am asking Mr. Ojo:  Is that the only thing

14  you are going to ask her about or are you going to ask her

15  about other things?

16           MR. OJO:  You said about the issue.  I said one

17  question about the particular, you know, topic that we were

18  talking about.

19           THE COURT:  Are you going to ask her about other

20  things other than that one topic?

21           MR. OJO:  Yes.

22           THE COURT:  Okay.  So that's where we are.  All

23  right.  Anything else?

24       All right.  Let's save our 45 seconds.  If she's the next

25  witness, if someone could bring her in while we are getting the

1   jury.  I don't know who to ask to go get her but somebody needs

2   to.  Maybe Mr. Hall can get her.

3           MR. HALL:  I will be happy to.

4           MR. OJO:  I definitely don't want to get her.

5           THE COURT:  I know you are not, yes.

6           MS. HAYES:  Your Honor, may I have a word with -- and

7   this can be in Mr. Hall's presence.

8           THE COURT:  A word with the witness?

9           MS. HAYES:  Yes.  Simply just to -- we told her we

10  would approach the Fifth Amendment.  She wasn't sure whether or

11  not she would be able to say I plead the Fifth, and I'd like to

12  confirm with that.

13          THE COURT:  That's fine.

14          MS. HAYES:  Thank you, Your Honor.

15          MR. OJO:  Your Honor, excuse me.  Do I have the same

16  right to speak to witnesses prior to them being called?

17          THE COURT:  It's not about -- well, we have the jury

18  coming in.  The answer would be yes, if they were willing to,

19  but how we would arrange that given your particular

20  circumstances would be complicated.  But it's the morning of

21  the last day.  That's a discussion we could have had two weeks

22  ago, but --

23          MR. OJO:  I didn't even know who was being called two

24  weeks ago, Your Honor.  I am just saying.

25          THE COURT:  I told you not to represent yourself, so

1   my level of sympathy --

2          (The jury panel enter the courtroom at 9:51 a.m.)

3              THE COURT:  You may all be seated.

4          Good morning, ladies and gentlemen.

5          (The jury panel reply, "Good morning.")

6              THE COURT:  How is everyone doing?

7          (The jury panel reply, "Good.")

8              THE COURT:  Two weeks and I think I am still seeing

9   smiles underneath the masks, so that's a good thing.  I

10  appreciate that.  I appreciate that you are back and here on

11  time.

12         We are ready to continue.  Swear in the witness.

13             THE DEPUTY CLERK:  Please raise your right hand.

14         ALEXANDRA BILLETER, DEFENDANT'S WITNESS, SWORN

15             THE DEPUTY CLERK:  You may be seated.  Please speak

16  loudly and clearly into the microphone.  Please state your name

17  for the record spelling your first and last name.

18             THE WITNESS:  Alexandra Billeter,

19  A-L-E-X-A-N-D-R-A --

20             THE DEPUTY CLERK:  Ma'am, if you could move closer to

21  the mike and speak into the microphone.

22             THE WITNESS:  Alexandra Billeter, A-L-E-X-A-N-D-R-A,

23  Billeter, B-I-L-L-E-T-E-R.

24             THE COURT:  All right.  Good morning, ma'am.  First,

25  let me just say if you are fully vaccinated, while you are

1  speaking, you can remove your mask.  You don't have to.  It's

2  only if you are comfortable doing so and you are fully

3  vaccinated.  If you are not fully vaccinated, then you would

4  have to keep your mask on.  Either way, as you were just

5  instructed, please make sure you are speaking into the

6  microphone so we can hear you.

7          I guess, formally, I should ask the defense to call the

8  witness.  Mr. Ojo.

9          Mr. Ojo, just for the record, I should have asked this

10  before, are you calling another witness?  I am not trying to

11  confuse you.  I should have just said that before.  Call your

12  next witness just for the record.  I know she is already

13  sitting there.

14          MR. OJO:  The next witness, I'd like to call

15  Ms. Billeter, Alexandra Billeter.

16          THE COURT:  Thank you.  It's my confusion.  I

17  apologize.  Your witness.

18                      DIRECT EXAMINATION

19  BY MR. OJO:

20  Q.    Good morning.

21  A.    Good morning.

22  Q.    In 2017, I believe, were you at the grand jury testimony

23  for Michael King?

24  A.    Can I actually have a copy of my grand jury statement to

25  reflect back because I believe it was 2018?

1    Q.    2018.

2              THE COURT:  I think the witness wanted to see it so

3    if maybe Mr. Hall can hand it to her.

4              MR. HALL:  Yes, Your Honor.

5              THE COURT:  I think she was asking to see it.  I

6    haven't heard an objection to it so you can show it to her.

7              THE WITNESS:  Thank you.  So it was Monday, August

8    19th, 2019.

9              MS. HAYES:  Your Honor, can I see what she is looking

10   at, please?

11             THE COURT:  Sure.  There might be confusion here.

12             MR. HALL:  I apologize.

13             THE COURT:  That's okay.  Just so we are all on the

14   same page --

15             MR. HALL:  I handed her the wrong one.

16             THE COURT:  Okay.  That's easy enough.  So maybe show

17   Mr. Ojo and Ms. Hayes and so we can make sure we are all on the

18   same page this time.

19             THE WITNESS:  Thank you.  Okay.  So December 3rd,

20   2018.  I was correct.

21             THE COURT:  I'm sorry.  Can you speak up?

22             THE WITNESS:  December 3rd, 2018.

23   BY MR. OJO:

24   Q.    Is that the only time that you were in front of a grand

25   jury?

1   A.      Yes.

2   Q.      Do you recall giving Agent Walsh information in 2017?

3   A.      I don't know an Agent Walsh.  I mean, I don't know last

4   names.

5   Q.      Do you see an agent in the courtroom that you gave

6   information to?

7   A.      My handler is not here, no.

8   Q.      Do you remember who your handler was?

9   A.      I just knew him by Chris.  I don't know -- like I said, I

10  don't know last names.

11  Q.      So you don't really -- you can't recall who you gave

12  information to?

13  A.      Yes, I can.  I am sure they don't give me last names for

14  safety purposes.  It's not my business.

15  Q.      So you just know someone by Chris?

16  A.      Somebody I talked to on a regular basis.

17  Q.      You talked to him on a regular basis?

18  A.      Then I did, yes.

19  Q.      And when you say "regular basis," what exactly do you

20  mean?

21  A.      I would send information, I would have to check in for

22  things, letting him know I am safe, things like that.

23  Q.      And this is during the time period where you were a paid

24  informant?

25  A.      No.

1  Q.    So this was during the time period where you were just an

2  informant?

3  A.    Yes.

4  Q.    Do you know roughly what time period that is?

5  A.    I believe it started September 2017.

6  Q.    September 2017?

7  A.    Mm-hmm.  Yes.

8  Q.    How did you become a cooperator or agent or cooperating

9  with the government?

10 A.    I was caught with drugs.

11 Q.    Could you tell us around what time period you were?

12 A.    August 2017.

13 Q.    So you were caught with drugs in August 2017 and you

14 became an informant with the government in 20 -- I mean in

15 September 2017?

16 A.    With Montgomery County, yes.

17 Q.    Do you recall in your testimony at the grand jury hearing

18 that you went to rehab?

19 A.    Yes.

20 Q.    Could you recall the time period that you went to rehab?

21 A.    I know I came back in May 2018.  I know it's here.  I'm

22 sorry.  It's been a while.

23         THE COURT:  And, ma'am, you should first try to see

24 if you can remember yourself before --

25         THE WITNESS:  It was in 2018.  I went to Boston.

1      THE COURT:  If you need to refresh your recollection,

2  you can ask, but try to just go by what you remember.

3      THE WITNESS:  No problem.

4  BY MR. OJO:

5  Q.    So do you know when you may have went -- left for rehab?

6  A.    Nine months prior to May 2018.

7  Q.    So --

8  A.    I'm sorry.  The dates --

9  Q.    Do you know -- were there rules pertaining to mobile

10 devices, cellular devices in the program that you were in?

11 A.    No, there were not.

12 Q.    So you were allowed to have your mobile devices and --

13 and cell phones and things of that nature?

14 A.    Yes.  You and I spoke numerous times while I was there.

15 Q.    Now, do you know -- do you remember what the

16 conversations were about?

17 A.    Absolutely.

18 Q.    While you -- while you were in --

19 A.    Yes.

20 Q.    Okay.  Could you give us an example of the conversation?

21 A.    Absolutely.  I would call to check on your daughter who

22 was still very small.  You would tell me how business was

23 going, what you were doing, if you were going to make a run to

24 purchase more drugs, things of that nature.

25 Q.    So while you were in Boston in rehab, I presume that I

1   called you or you called me?

2   A.    I am sure it could have gone either way.  Like I said, we

3   spoke numerous times.

4   Q.    So while you were in another state --

5            THE COURT:  I'm sorry.  Just one second.  Ma'am,

6   while you are testifying, just leave the document there.  If

7   you need to refer to it, he will either guide you there or you

8   can ask --

9            THE WITNESS:  I was trying to find the date which I

10  was away.

11           THE COURT:  For now, don't worry about that.  Just

12  answer his questions.

13  BY MR. OJO:

14  Q.    Were you asked to testify at Mr. Ojo's grand jury

15  indictment -- or grand jury?

16  A.    If you are asking if they asked me to do it?

17  Q.    That's exactly what I asked.

18  A.    No.  I offered.

19  Q.    So you -- I mean, let me rephrase that.  Not Mr. King's,

20  Mr. Ojo's --

21           MS. HAYES:  Objection, Your Honor.  May we sidebar?

22           THE COURT:  Sure.  Sidebar.

23       (The following took place at sidebar outside the presence

24  of the jury; all counsel present.)

25           THE COURT:  I can -- can you hear me?

1           MR. OJO:  Yes.

2           MS. HAYES:  Sorry, Your Honor.  So at the -- can you

3   hear me now?  At the top of Ms. Billeter's --

4           THE COURT:  Let me ask:  If you are choosing to keep

5   your mask on, that's fine, but that might help.

6           MS. HAYES:  Sorry, Your Honor.  Is this better?

7           THE COURT:  Yes.

8           MS. HAYES:  At the top of Ms. Billeter's grand jury

9   transcript, there is a caption.  It's a caption that has

10  Michael King's name on it because, as you are aware, the

11  investigations began with Mr. King.  The testimony is about

12  Mr. Ojo.  Ms. Billeter has nothing to do with the caption

13  that's at the top of the grand jury transcript.  And I think

14  Mr. Ojo is confused in that there is a grand jury that's

15  administratively opened that may have any name on it, but that

16  doesn't make it Mr. King's or Mr. Ojo's grand jury, and I

17  suspect that that's what Mr. Ojo is trying to get at, which

18  would only serve to confuse the jury, and, therefore, we would

19  object on 403 grounds.

20          THE COURT:  All right.  So I probably would have

21  sustained that in response to his first question, but we have

22  kind of gone down the road at this point.  The clarification is

23  helpful, I am sure, to Mr. Ojo, and, if necessary, you can

24  clean it up on cross.

25          And Mr. Ojo, I will say that you shouldn't stay on this

1   much longer.  You can clean up wherever you are and then let's

2   move on.  I forgot what your last question was at this point.

3   You can restate it, and then if there is an objection, I will

4   rule on it at that point.

5           MS. HAYES:  Thank you, Your Honor.

6           MR. OJO:  Now, you see, that's why most of my

7   questions was based on the information that I was given and it

8   was from the grand jury.  I did not know that this -- all I got

9   was Mr. King, *United States vs. Mr. King*, that information.

10  That's why I was trying to ask if there were other times that

11  she went to -- so I can get an understanding.  I didn't know if

12  --

13          THE COURT:  I understand that.  And so you got the

14  explanation.  Now let's move on.

15          MR. OJO:  All right.  So just to clarify, stop asking

16  her about the grand jury?

17          THE COURT:  I don't remember what your last question

18  was.  I will suggest that it's probably best to move on.  But

19  if you want to ask her a question, I will hear the question, I

20  will hear an objection, and make a decision.

21          MR. OJO:  Okay.  Thank you.

22          (End of sidebar discussion.)

23  BY MR. OJO:

24  Q.   Just disregard the last question.

25          Is it fair to say that you are no longer a paid informant

1    with the United States Government?

2    A.    Yes.

3    Q.    Can I ask why?

4    A.    I plead the Fifth.

5    Q.    In 2018, I believe you --

6         THE COURT:  I'm sorry.  If it's a question for the

7    witness, I don't allow that.  Do you have an issue?

8         A JUROR:  I am having an issue hearing.  It's very

9    muffled.

10        THE COURT:  I understand.  Especially since you have

11   the mask on, which you are allowed to keep on if you wish, just

12   make sure you are speaking into the microphone.

13        Did you hear her last answer?

14        A JUROR:  No.

15        THE COURT:  Please repeat your last answer.

16        THE WITNESS:  I plead the Fifth.

17        A JUROR:  Oh, okay.

18   BY MR. OJO:

19   Q.    In 2018, roughly around May, you were still in, you said

20   Boston, in rehab in Boston.  Correct?

21   A.    I came back in May, yes.

22   Q.    So there is no way that you would be in the DMV area

23   prior to that, months prior, just prior to that, let's say the

24   end of -- the end of '17?  Is there any way that you would have

25   been in the DMV area?

1          MS. HAYES:  Objection.  Form.

2          THE COURT:  If you understand the question, you can

3  answer the question.

4          THE WITNESS:  I mean, I really -- I really don't

5  understand.  I mean, I can get you the exact date I left for

6  rehab.  I was there for seven months.

7  BY MR. OJO:

8  Q.    That's perfect.  So the exact date that you left was --

9  A.    I am not -- like I said, I can look and let you know if

10  that's something --

11          THE COURT:  Are you asking her to refresh her

12  recollection as to that point?

13          MR. OJO:  Yes, please.

14          THE COURT:  You can do that by looking at the

15  transcript.

16          THE WITNESS:  I'm sorry.  Give me one second.

17          THE COURT:  And I don't know if this is true or not,

18  if there is anyone who knows what page to refer her to, that

19  may be helpful.

20          THE WITNESS:  Please.

21          MR. OJO:  I didn't see it in there.  That's why I was

22  asking.

23          MS. HAYES:  Page 20, Your Honor.

24          THE COURT:  It sounds like you should go to page 20.

25  Thank you, Ms. Hayes.

```
 1            THE WITNESS:  I don't see it on page 20.
 2            MS. HAYES:  Sorry.  It's the bottom of page 20 onto
 3   page 21.
 4            THE WITNESS:  I'm sorry.  I left in December and I
 5   came back in May.
 6   BY MR. OJO:
 7   Q.    You left in December and came back in May.
 8         And that was December of 2017.  Correct?
 9   A.    Correct.
10   Q.    Now, at any point did you and Mr. Ojo live together?
11   A.    Yes.
12   Q.    Could you tell us when that was, please?
13   A.    Give me one second.
14            THE COURT:  Just for the record, are you asking her
15   to refresh her recollection with the transcript?
16            MR. OJO:  No.
17            THE COURT:  No.  I am asking her.
18            THE WITNESS:  It was in 2017.
19   BY MR. OJO:
20   Q.    Yeah.  What I am asking is:  Do you know roughly the
21   month, the time period that you and Mr. Ojo lived together?
22   A.    And I'm saying if you give me a moment, I can refer back
23   to this.
24   Q.    So you don't know --
25   A.    It was before I went to rehab for several months, so I
```

```
 1   believe around March 2017 possibly, March, April.
 2   Q.    When did you meet Mr. Ojo?
 3   A.    Roughly around then.  It wasn't long before we moved in
 4   together.
 5   Q.    How long did -- so was this March of 2017 --
 6   A.    Correct.
 7   Q.    -- that you met Mr. Ojo?
 8   A.    (Witness nods.)
 9            THE COURT:  Was that a yes?
10            THE WITNESS:  Correct.
11   BY MR. OJO:
12   Q.    How did you meet Mr. Ojo?
13   A.    Through Michael King and Brittney Seal.
14   Q.    And that was, as you said, around March?
15   A.    A little previous to that, yes.
16   Q.    When did you say you became an agent?
17   A.    September 2017.
18   Q.    And the instance that led to you becoming an agent, when
19   was that?
20   A.    I'm sorry.  That was September 2017.  I became an agent,
21   if you will, in August -- I'm sorry, in October, a month after.
22   Q.    So the incident that led to you becoming an agent
23   happened --
24   A.    September.
25   Q.    -- in September?
```

```
1   A.    Correct.
2   Q.    At any point were you going to Baltimore, meeting any
3   dealers in Baltimore during that time period?
4   A.    Can you rephrase that?  Like, are you asking for you or,
5   like, for myself?
6   Q.    For yourself or anybody.
7   A.    For you, yes.
8   Q.    So were you going alone?
9   A.    No.  Well, I think I went alone once.  You sent me with
10  cash.
11  Q.    So you went to Baltimore alone to meet a dealer?
12  A.    One time.  The rest, you were with me.
13  Q.    Now, during the time period that you and Mr. Ojo were
14  living together, were you involved with a Michael King?
15  A.    That's how I met you.  Through you, yes.
16  Q.    What I am saying is did you -- were you involved -- did
17  you have interactions with Michael King?
18  A.    Yes.
19  Q.    Now, do you know a Renee Lineberry?
20  A.    Yes.
21  Q.    During the months of December '17 until May '17 (sic),
22  did you have interactions with Ms. Lineberry by way of
23  Facebook?
24  A.    I don't recall.
25  Q.    So did you -- you don't recall if you ever took her to
```

1   Baltimore?

2   A.    I was in rehab during those months, so my priority at the

3   time was to speak with you.  I don't remember if I even had

4   Facebook anymore then.  At one point, I had locked myself out

5   of an account.

6   Q.    Do you remember if Mr. Ojo's account was -- was locked

7   out during that time period?

8   A.    I don't -- honestly, I don't.

9   Q.    Have you ever used Mr. Ojo's social media or promoted

10  music for Mr. Ojo or anything to further his music career?

11  A.    So the first part of your question, no, I have never used

12  your social media accounts.  Second, if you had posted a song,

13  I would re-post it.

14  Q.    Has Mr. Ojo ever used your or -- I don't mean to bring

15  your son in this -- your son's devices, tablet to log into any

16  of his social media accounts?

17  A.    I don't believe so.  My son wasn't living with us then.

18  Q.    But he was coming over weekends and spending time there

19  with the three of us.  Correct?

20  A.    Correct.  But no, you did not.

21  Q.    Is it fair to say that there were times when Mr. Ojo

22  would go to work and possibly leave his cellular phones and

23  things of that nature at the house?

24  A.    You never parted with your cell phones.

25  Q.    At all?

1   A.    No.  No.

2   Q.    So there would be --

3   A.    Either one of them.

4   Q.    So out of the two cell phones, Mr. Ojo would have never

5   parted with any of the cell phones?

6   A.    Not unless the service was disconnected.

7   Q.    Do you know a time period where maybe Mr. Ojo's service

8   was disconnected?

9   A.    You were living in West Virginia at that point.

10   Q.    So during that time, there was no contact with Mr. Ojo

11   because there was -- I mean through the cellular phone that you

12   are referring to?

13   A.    No.  One of your cell phones was disconnected for like a

14   day.  One of them was always in service.

15   Q.    Oh, so the phone was only disconnected for a day is what

16   you are saying?

17   A.    It wasn't a long period of time.  Correct.

18   Q.    Now, there has been a lot of testimony about cellular

19   phones and, you know, things of that nature.

20            MS. HAYES:  Objection.

21            THE COURT:  Sustained.  You shouldn't ask the witness

22   about testimony.  She hasn't been here.  Just ask the question.

23   BY MR. OJO:

24   Q.    Let me see if I can rephrase this.  Has there been any

25   other males living with you at the house that you shared with

1    Mr. Ojo?

2              MS. HAYES:  Objection.  Time frame?

3              THE COURT:  If you could provide a time frame, that

4    would be helpful.

5    BY MR. OJO:

6    Q.    During 2018?  During 2017?

7    A.    No.

8    Q.    In 20 -- I believe 6/18/2018, do you recall that time

9    period or that day?

10             MS. HAYES:  Objection.  The date.

11             THE WITNESS:  July.

12             THE COURT:  If you could restate the question.

13   BY MR. OJO:

14   Q.    I'm sorry.  7/18 -- or 7/16, I should say.

15   A.    Yes.

16   Q.    7/16/2018?

17   A.    Yes.

18   Q.    Do you remember the incidents that happened that day?

19   A.    Yes.

20   Q.    Was there a reason for you to contact Mr. Ojo that day?

21   A.    Yes.

22   Q.    And was that reason to provide information for the

23   government?

24   A.    Yes.

25   Q.    So you were advised to do something that day?

1         MS. HAYES:  Objection.  Leading.

2         THE COURT:  Overruled.  Overruled.

3         THE WITNESS:  Based on previous information I had

4    given them, this was the next step, yes.

5    BY MR. OJO:

6    Q.    So what was the previous information that you gave them?

7    A.    Well, I was caught with your drugs.

8    Q.    When was this?

9    A.    In September of 2017.

10   Q.    So the last thing that transpired was September of 2017?

11   A.    I am sure there had been pictures sent of drugs, weights,

12   things of that nature.

13   Q.    In --

14   A.    It's not like I was just sent on a whim to do something

15   for them.

16   Q.    Are we talking about while you were at rehab?

17   A.    No.

18   Q.    So prior to July, the last time that you were, I don't

19   know, of any service to them in regards of actual physical

20   evidence or proof was before you went to rehab.  Correct?

21   A.    So I became an agent in October 2017.  I left for rehab

22   in December.  Previous to that, I had provided information.  So

23   while I was away, I was still giving information from things

24   that you would tell me, and when I came back in May, there were

25   things, pictures sent, things that I had given them.  And now

1   in July, this was the next step in that process.

2   Q.    Okay.  So other than alleged phone calls of description

3   of events going on, you really have no information as to what

4   Mr. Ojo was doing or --

5            MS. HAYES:  Objection, Your Honor.

6            THE COURT:  Let him finish the question.

7   BY MR. OJO:

8   Q.    -- what Mr. Ojo was doing.  Correct?

9            THE COURT:  I am going to overrule.  You can answer

10  the question.

11           THE WITNESS:  So the time that I was away, did I

12  physically see you do things?  No.  Did you tell me things you

13  had done?  Yes.  Before I had left, I had physically been

14  involved in things with you that I had provided as well as when

15  I got back in May 2018.

16  BY MR. OJO:

17  Q.    Were you ever pulled over or charged or arrested for any

18  incident with you and Mr. Ojo together in a vehicle?

19  A.    No.

20  Q.    So while you were an agent, would you say that there were

21  times when you and Mr. Ojo were making trips to Baltimore?

22  A.    Yes.

23  Q.    During that time period, was Mr. Ojo paying you for any

24  of your services?

25  A.    No, not while I was an agent.

```
 1   Q.     So was Mr. Ojo providing you with anything during that
 2   time period?
 3   A.     Previous to me becoming an agent, yes.
 4   Q.     So you were only going to Baltimore with Mr. Ojo just to
 5   gather information for the government?
 6   A.     If that was what the next step in that process required,
 7   yes.
 8   Q.     So how did the request for these trips transpire?
 9   A.     I would not use the word "request."  It was more, Hey --
10   they knew we were together all the time, so if you were going
11   -- if you needed to go to Baltimore and I would be driving you,
12   before we left or on the way, I would let them know.  I would
13   let them know exactly what was picked up, where we were, who we
14   met, things of that nature.
15   Q.     So how many times would you say that you and Mr. Ojo went
16   to Baltimore?
17   A.     Many.
18   Q.     Many.  Would you say --
19   A.     Fifteen, 20.
20   Q.     Maybe more?
21   A.     Possibly.
22   Q.     How often would you and Mr. Ojo go to Baltimore?
23   A.     Two, three times a week.
24   Q.     Now, you said that you would inform the government of
25   your location.
```

1          You would do what, send text messages or different things

2     of that nature?

3     A.     Yes.

4     Q.     And the reason for this -- so was it for the data to be

5     collected.  Correct?

6     A.     That was also a safety measure.

7     Q.     And when you say "safety measure," what exactly do you

8     mean?

9     A.     So they knew where I were -- where I was.  Like, I wasn't

10    just allowed to galavant freely.  If they said don't go --

11    like, I said, Hey, we are thinking about doing this, if they

12    said absolutely not, I wouldn't have done it, you know what I

13    mean?  Like, it was just a security on myself.

14    Q.     Fair.

15          Now, do you know of the surrounding area of Security

16    Mall?

17    A.     Yes.  Yes.

18    Q.     Have you ever been there without Mr. Ojo?

19    A.     No.

20    Q.     Have you ever been anywhere in Baltimore without Mr. Ojo

21    in reference to purchasing illegal drugs?

22    A.     Like I said previously, you sent me one time by myself.

23    Q.     So from 2000 -- well, you met in --

24    A.     '17.

25    Q.     -- 2017 around, you said maybe March or so when we met?

1    A.    Yes.

2    Q.    You never --

3          THE COURT:  Just one second.  Ladies and gentlemen,

4    again, if you need to stand and stretch at some point, that's

5    fine.  I do need you to try to stay alert.  Thank you.

6          You can continue.

7    BY MR. OJO:

8    Q.    So during that time period, you never went to Baltimore

9    by yourself?

10   A.    There was one time I did relapse while I was an agent and

11   I did, yes.

12   Q.    So the times when you relapsed while you were an agent,

13   did you advise --

14   A.    Absolutely.

15   Q.    -- the government?

16   A.    And they got me help.

17         THE COURT:  Ma'am, you have to wait until he finishes

18   the question.

19         THE WITNESS:  I'm sorry.

20   BY MR. OJO:

21   Q.    And they got you help.  Right?

22   A.    They allowed me to get help, yes.

23   Q.    So when you got help, what time period would you say this

24   was?

25   A.    Honestly, I don't recall.  It was after almost a year

1    clean.

2    Q.    And what time period was that?

3    A.    I got back from rehab in May 2018, so to the best of my

4    recollection, it was late 2018 that I relapsed, I believe.

5    Q.    While you were officially an agent?

6    A.    Yes.

7    Q.    Have you -- during that time period, did you see Mr. Ojo

8    or -- I'm talking after -- after July of '16, did you see

9    Mr. Ojo, talk to Mr. Ojo?

10   A.    Honestly, I don't recall.  I assume we did.  I can't give

11   you exact dates.

12         MS. HAYES:  Objection.  Can we just clarify the date?

13   I think you said "July of '16."  I don't know if that was a

14   year or --

15         MR. OJO:  2018.

16   BY MR. OJO:

17   Q.    So you assume that we spoke and we interacted after that?

18   A.    Yes.  Yes.

19   Q.    Would you say that was once or would you say it was

20   constant communication or --

21   A.    It was probably very sporadic at that point.  You were

22   living out of state.

23   Q.    Okay.  So how many times would you say that you came out

24   of state to visit Mr. Ojo?

25   A.    Numerous.

1    Q.    Numerous?

2    A.    More than a handful.

3    Q.    And this was prior to July 2018?

4    A.    I believe so prior and probably once or twice after.

5    Q.    So do you know when Mr. Ojo moved to Martinsburg, West

6    Virginia?

7    A.    Yes.  Well, I don't know the exact month or date, but it

8    was while I was away in Boston, so from December of 2017 -- I

9    mean, he was already established in May of 2018, so sometime in

10   between there.

11   Q.    Okay.

12         MR. OJO:  No further questions.

13         THE COURT:  Cross-examine.

14                        CROSS-EXAMINATION

15   BY MS. HAYES:

16   Q.    Good morning, Ms. Billeter.

17   A.    Good morning.

18   Q.    Excuse me.  If you will just give me one moment while we

19   set this up.

20         MS. HAYES:  The Court's indulgence.

21   BY MS. HAYES:

22   Q.    Sorry.  Good morning, Your Honor.  Or good morning,

23   Ms. Billeter.

24   A.    Good morning.

25   Q.    Ms. Billeter, you were asked if you testified before the

Bl - Peter - Cross

```
1   grand jury, and I believe you stated that that was on December

2   3rd of 2018.  Is that correct?

3   A.    Yes.

4   Q.    Okay.  And you have at times referred to your grand jury

5   testimony.

6         Is it fair to say that your testimony in 2018 was closer

7   in time and therefore your memory was better than sitting here

8   today?

9   A.    Absolutely.

10             MR. OJO:  Objection, Your Honor.

11             THE COURT:  Basis?

12             MR. OJO:  She was asked if she remembered that time

13   period.

14             THE COURT:  Overruled.

15   BY MS. HAYES:

16   Q.    And although maybe some of the details are a little

17   fuzzy, the overall relationship that you had with Mr. Ojo, is

18   that pretty clear?

19   A.    Yes.

20   Q.    And now the -- you were asked a couple questions, just, I

21   want to set the time frame.

22         So you were -- met Mr. Ojo in about March of 2017.  Is

23   that correct?

24   A.    Yes.

25   Q.    And shortly thereafter, you moved -- he moved in with
```

1  you.   Correct?

2  A.     Yes.

3  Q.     Okay.  And then in September of 2017, you were caught

4  with drugs.  Is that correct?

5  A.     Correct.

6  Q.     Where did those drugs come from?

7  A.     Mr. Ojo.

8  Q.     And was Mr. Ojo with you at that time?

9  A.     No.

10 Q.     And how do you know that they were from Mr. Ojo?

11 A.     He left them at my house for me to sell.

12 Q.     And were you in the process of selling them?

13 A.     Yes.

14 Q.     And had you collected -- were you going to the buy or

15 coming home from the buy?

16 A.     Going.

17 Q.     And how much, if you recall, how many -- how much drugs

18 did you have on you?

19 A.     It wasn't a lot.  A few grams of heroin.

20 Q.     And who were you going to meet?

21 A.     Tanner Coke.

22        THE COURT:  Can I ask counsel to slow down just a

23 little?

24        MS. HAYES:  Sorry.

25 BY MS. HAYES:

1   Q.    And was Mr. Coke a customer of Mr. Ojo's?

2   A.    Yes.

3   Q.    And at that time would you have considered him a customer

4   of both you and Mr. Ojo's?

5   A.    Yes.

6   Q.    And was that because you were working with Mr. Ojo in his

7   drug business?

8   A.    Yes.

9   Q.    And you weren't a source at that time?

10  A.    Correct.

11  Q.    And then after you were caught with Mr. Ojo's drugs, you

12  were signed up as a source with Montgomery County.  Is that

13  correct?

14  A.    Correct.

15  Q.    And at no point when you were signed up with Montgomery

16  County were you paid any money.  Is that right?

17  A.    Absolutely.

18  Q.    Okay.  And then you signed up with the FBI later in 2018

19  after you returned from rehab.  Is that right?

20  A.    Correct.

21  Q.    Okay.  So you stated that you were in rehab between, I

22  believe you said December of 2017 and May of 2018.  Is that

23  right?

24  A.    Correct.

25  Q.    Okay.  And during that time period, what type of rehab

Bri Peter - Cross

```
 1  facility was this?
 2  A.    A sober living house.
 3  Q.    So in sober living houses, are they different than kind
 4  of in treatment facilities?
 5  A.    Yes.
 6  Q.    And how are they different?
 7  A.    So an inpatient facility, they -- they limit your
 8  contact.  So there is no Internet.  You can make two phone
 9  calls a day.  You stay in a building.  Sober living, it's
10  literally a house.  You have free reign.  You can work.  You
11  can go to classes.  You can go to meetings.  You can have your
12  cell phone.  Things of that nature.
13  Q.    And is it fair to say that the in -- the in-house
14  treatment, that typically lasts a shorter period of time?
15  A.    Yes.
16  Q.    But you can live for much longer periods of time in a
17  sober living facility?
18  A.    Correct.
19  Q.    Now, after you came out -- so during the sober living
20  facility, which I believe you stated was in Boston, you had
21  regular communication with Mr. Ojo?
22  A.    Yes.
23  Q.    And he would provide you information about his drug
24  trafficking business?
25  A.    We would have conversations, yes.
```

1    Q.    Okay.  And what would he tell you -- not specifics, but

2    generally what types of things would Mr. Ojo tell you about his

3    drug trafficking business?

4    A.    Basically, it would kind of go like, Hey, how is your

5    day?  Oh, it's been busy.  Oh, well, what's going on?  Oh, I

6    have to go to Baltimore.  I am running out of stuff.  Or I have

7    seen a lot of people.  Or it's been a slow day.  Things of that

8    nature.

9    Q.    Okay.  And at that time when you were in the sober living

10   facility, was it that period of time where you were driving

11   Mr. Ojo to Baltimore?

12   A.    No.

13   Q.    Okay.  And prior to the sober living facility, and, in

14   fact, prior to becoming a source, did you drive Mr. Ojo to

15   resupply in Baltimore?

16   A.    Yes.

17   Q.    And approximately how many times during that period of

18   March 2017 through you being a source in September of 2017

19   would you drive Mr. Ojo to resupply?

20   A.    At least two to three times a week.  We were living

21   together.

22   Q.    And then after you got out of your sober living facility,

23   that was about May of 2018?

24   A.    Correct.

25   Q.    Okay.  Did you then begin again seeing Mr. Ojo in person?

Butler - Cross

1    A.    Yes.  He picked me up from the airport.

2    Q.    Were you sober at that time?

3    A.    Yes.

4    Q.    And until July 16th of 2018, did you maintain regular

5    communication with Mr. Ojo?

6    A.    Yes.

7    Q.    Do you see him in person?

8    A.    Yes.

9    Q.    And during that time period, did you also continue to

10   drive, as you did in the 2017 time period, Mr. Ojo to his

11   sources of supply?

12   A.    Yes.

13   Q.    And where was that located?

14   A.    From West Virginia to Baltimore.

15   Q.    And then you also, during that time, provided information

16   from -- to law enforcement as it was happening.  Is that

17   correct?

18   A.    Correct.

19   Q.    Now I am just going to show you a few -- oh, man.  Excuse

20   me.  Let me restart this up.

21         I am going to show you what's been previously marked as

22   Photo 9.

23         Do you recognize this photo?

24   A.    Yes.

25   Q.    What is it?

Bil Peter - Cross

```
 1  A.    It's my house.
 2  Q.    And is this the house that Mr. Ojo lived with you at?
 3  A.    Yes.
 4  Q.    And just to clarify, did you ever call Mr. Ojo by any
 5  other names or nicknames?
 6  A.    D, JO.
 7  Q.    I'm sorry.  What was it?
 8  A.    JO or D.
 9  Q.    JO?
10  A.    Yes.
11  Q.    Or D?
12        And I am going to show you just, again, briefly -- and
13  were you familiar with where Mr. Ojo lived prior to moving in
14  with you?
15  A.    Yes.
16  Q.    Where was that?
17  A.    About three blocks from me.
18  Q.    And had you visited him at that house?
19  A.    Yes.
20  Q.    I am going to show you what's been marked as Photo 7.
21        Do you recognize this?
22  A.    Yes.
23  Q.    What is it?
24  A.    His house.
25  Q.    Now, I want to talk briefly about how you first met
```

Bilal Peters - Cross

 1  Mr. Ojo.

 2      I believe you said that you met him through Mr. King and

 3  Brittney Seal.  Is that correct?

 4  A.    Correct.

 5  Q.    And this is in the March 2017 time frame?

 6  A.    Yes.

 7  Q.    All right.  And tell -- can you describe the

 8  circumstances under which you met Mr. Ojo through Mr. King and

 9  Ms. Seal?

10  A.    Yes.  So I tried with Mr. King to buy some crack cocaine.

11  He did not have it.  They then said they needed to go get more

12  and asked if I would give a ride and I did and that's how I met

13  Mr. Ojo.

14  Q.    So when you said Mr. King needed more, what did he need

15  more of?

16  A.    Crack and heroin.  I mean, the crack for me.

17  Q.    And he didn't have the crack cocaine that he needed to

18  give you?

19  A.    Correct.

20  Q.    So he asked you to take him to another location.  Right?

21  A.    Yes.

22  Q.    And who was at that location?

23  A.    Mr. Ojo.

24  Q.    And do you recall exactly what that location was?

25  A.    That -- that house, that townhouse, yes.

1    Q.    And just for reference, pulling up Photo 7, is that what

2    you are referring to?

3    A.    Yes.

4    Q.    And did you and Mr. King get more drugs from Mr. Ojo that

5    day?

6    A.    Yes.

7    Q.    And now after meeting Mr. Ojo that day, is that when your

8    friendship or relationship with Mr. Ojo formed?

9    A.    Yes.

10   Q.    Why?

11   A.    I mean, I realized he only lived literally maybe three

12   blocks from me, so it was convenient.  He didn't have a license

13   or a car and I did, so it was like a mutual beneficial thing.

14   Q.    And to be clear, during this time when you were

15   purchasing drugs from Mr. King and were introduced to Mr. Ojo

16   to get more drugs, you were not a government source.  Correct?

17   A.    Correct.

18   Q.    At some point did Mr. Ojo get another woman pregnant?

19   A.    Yes.

20   Q.    And as a result of that, did he move out of your house?

21   A.    No.

22              MR. OJO:  Objection, Your Honor.

23              THE COURT:  Basis?

24              MR. OJO:  Relevance.

25              THE COURT:  I will overrule it, but let's stay on

B. Peter - Cross

```
 1   topic.
 2            THE WITNESS:  She was pregnant before I had met him.
 3   BY MS. HAYES:
 4   Q.    And was that baby born?
 5   A.    Yes.
 6            MR. OJO:  Objection, Your Honor.
 7            THE COURT:  Overruled.
 8   BY MS. HAYES:
 9   Q.    Do you recall where Mr. Ojo lived after he moved out of
10   your residence?
11   A.    Various hotels.
12   Q.    Where were those hotels located?
13   A.    Frederick for the most part.  Yeah.
14   Q.    Do you remember any specific hotels?
15   A.    The Super 8 Extended Stay.
16   Q.    And then at some point while you were in rehab between
17   December of 2017 and May of 2018, he moved to West Virginia.
18   Is that correct?
19   A.    Yes.
20   Q.    During the time period that Mr. Ojo lived in West
21   Virginia, did he buy a Mercedes?
22   A.    Yes.  He had a Mercedes.
23   Q.    At that time, was he working?
24   A.    Not to my knowledge.
25   Q.    Have you ever known Mr. Ojo to work?
```

Bi Peter     Cross

1   A.    Yes.

2   Q.    And when was that?

3   A.    When we lived together, it was, I believe, like a

4   contracting type business where I would drive him.

5   Q.    And how long was -- did he work during that time frame

6   when you lived together?

7   A.    Not very long.  Maybe a month.

8   Q.    And did he continue to engage in the drug trafficking

9   business while he was working?

10  A.    Yes.

11  Q.    Did you also know Mr. Ojo to rent vehicles?

12  A.    Yes.

13  Q.    And why would he rent vehicles?

14  A.    Because at that point, he did not have one yet.

15  Q.    Would he rent -- to your knowledge, would he rent them in

16  his name or other people's names?

17  A.    I honestly can't say.

18  Q.    Now, prior to becoming a source in September of 2017,

19  were you frequently given heroin and crack cocaine from Mr. Ojo

20  in exchange for doing favors for him?

21  A.    Yes.

22  Q.    And what kind of favors did you do for him?

23  A.    Sold drugs.

24  Q.    And would you consider yourself, prior to being --

25          MR. OJO:  Objection, Your Honor.  She answered the

Bil Peters - Cross

 1   same question.

 2             THE COURT:  Overruled.  That's not an objection.  You

 3   will have redirect.  But overruled.

 4   BY MS. HAYES:

 5   Q.    And have you ever seen Mr. Ojo use crack cocaine?

 6   A.    No.

 7   Q.    Have you ever seen him use heroin?

 8   A.    No.

 9   Q.    Have you ever seen him use Molly?

10   A.    No.

11   Q.    You spent a lot of time with him.  Right?

12   A.    Absolutely.

13   Q.    And, ma'am, did you -- I referred to them as "favors."

14   And you said you sold drugs on his behalf.  Is that right?

15   A.    Correct.

16   Q.    Now, prior to becoming a source, would you have

17   considered yourself a part of that drug trafficking business?

18   A.    To an extent.

19   Q.    So you helped him distribute the drugs?

20   A.    Yes.

21   Q.    And you helped him to obtain more drugs, resupply?

22   A.    Yes.

23   Q.    And in exchange for -- at that same time period, were you

24   also being provided drugs for your own personal use?

25   A.    Yes.

1   Q.    What drugs did you use?

2   A.    Heroin and crack cocaine.

3   Q.    And did those drugs come from Mr. Ojo?

4   A.    Yes.

5   Q.    And to be clear, just prior to becoming a source.

6   Correct?

7   A.    Correct.

8   Q.    When you sold drugs on behalf of Mr. Ojo, would you get

9   money?

10  A.    No.

11  Q.    From the customer?  Sorry.  From the customers?

12  A.    Oh, yes.

13  Q.    Okay.  And, well, to answer another question, would you

14  get money from Mr. Ojo?

15  A.    No.

16  Q.    So where would the money that you gave to Mr. Ojo go --

17  excuse me, that you got from Mr. Ojo's customers go?

18  A.    To Mr. Ojo.

19  Q.    How many customers do you recall personally delivering

20  to?

21  A.    At least 15 different people.

22  Q.    Fifteen different people?

23  A.    Yeah.

24  Q.    And would you continue to serve repeatedly those same 15?

25  A.    Yes.

1  Q.    Now, we talked a bit about driving Mr. Ojo to resupply,

2  and I believe you were asked if it was an area of Security

3  Mall.

4        Do you remember that?

5  A.    Yes.

6  Q.    I am going to show you what's been marked as SURV 6.

7        Do you recognize this?

8  A.    Yes.  Yes.

9  Q.    How do you recognize it?

10 A.    We would go there to pick up drugs.

11 Q.    And specifically where -- was there a specific area

12 within this photograph that you would go to with Mr. Ojo?

13 A.    So where the little red marker is, around that area,

14 there was an apartment building.  It was highly confusing

15 because there is two different parking.  It's kind of like

16 subset, but yes.

17 Q.    And how did you know that Mr. Ojo was going there to get

18 more drugs?

19 A.    He asked me to drive him.

20 Q.    And did he tell you that he was going to get more drugs?

21 A.    Yes.

22 Q.    And did you see the drugs he got?

23 A.    Yes.

24 Q.    And how would you -- approximately what would be, on

25 average, the amount of drugs that you saw Mr. Ojo get when you

1  would go to that area to resupply?

2  A.    I mean, I can't say for sure, but we never spent less

3  than at least $1500.

4  Q.    And how did Mr. Ojo pay for those drugs?

5  A.    Cash.

6  Q.    And would Mr. Ojo weigh the drugs?

7  A.    Sometimes.

8  Q.    And where would he weigh them?

9  A.    Either in the car or once we got back home.

10  Q.    And as you were transporting the drugs back from this

11  area specifically, where would Mr. Ojo put those drugs?

12  A.    In his pants.

13  Q.    What do you mean by "in his pants"?

14  A.    Near his butt.

15  Q.    Do you recall a time when Mr. Ojo told you that he had

16  been stopped by Mount Airy Police and searched?

17  A.    I don't know if it was Mount Airy Police or troopers, but

18  yes.

19  Q.    And what did he tell you about that stop?

20  A.    He said they pulled him over on some -- some bullshit --

21  excuse my language -- and they asked if he had anything in the

22  car.  He had the baby with him at that time.  I believe he did

23  say they searched the vehicle.  They did not find anything.

24  But the trooper or the officer had let a name slip out of his

25  -- out of his mouth, which, obviously, he recognized.

Billeter - Cross

```
 1   Q.    How did he recognize that name?
 2   A.    I mean, that's how I learned it.  I learned that's one of
 3   the people we would go to in Baltimore.
 4   Q.    And then did he tell you whether or not he was -- his
 5   person was searched?
 6   A.    Yes.  He said it was not.
 7   Q.    And did he tell you where the drugs were on him that day?
 8   A.    In his pants.
 9   Q.    And what do you mean by "in his pants?
10   A.    Near his butt.
11   Q.    Did you know Mr. Ojo, toward the end of your
12   relationship, to begin distributing Molly?
13   A.    Our relationship, like --
14   Q.    I'm sorry.  I will direct you to it.
15         So after you got out of rehab in May of 2018 and Mr. Ojo
16   was living in West Virginia, did you know Mr. Ojo to begin
17   distributing -- or to be distributing Molly in that time frame?
18   A.    Yes.
19   Q.    Now, prior to becoming a source, Ms. Billeter, did you
20   keep a ledger of the drug sales you made on behalf of Mr. Ojo?
21   A.    Yes.
22   Q.    And did you provide a copy of that ledger to law
23   enforcement?
24   A.    They got it when I was stopped, yes.
25   Q.    What do you mean by they got it when you were stopped?
```

Bri Peter - Cross

1    A.    When I was arrested -- well, when I was stopped with his

2    drugs back in 2017, before becoming a source, I had it on me.

3    I would carry it on me for when I went to make sales to write

4    down how much money I received, like, the quantity somebody

5    bought.  Just -- and I'd even write down the time and the date

6    I'd give Mr. Ojo that said money just so there was no question

7    of me stealing.

8    Q.    And that was seized from your vehicle on the day you were

9    stopped after -- on your way to distribute drugs for Mr. Ojo?

10   A.    Correct.

11   Q.    I am going to show you what's been marked as MISC 10.

12   Excuse me while I am trying to clear.  I am just going to flip

13   through this.  It's a multi-page document.

14         Do you recognize this?

15   A.    Yes.  Yes.

16   Q.    What is it?

17   A.    It's the ledger of sales.

18   Q.    And whose handwriting is on this?

19   A.    Mine.

20   Q.    And up here on the top, there is a date that says 7/20.

21   And if you flip through this, for example, on page 3, there is

22   also another date that said July 22nd of 2017.

23         What do those dates entail?

24   A.    So when I'd write the date at the top, that would be the

25   -- the date with the information under it.

1  Q.    And who directed you to maintain this information?

2  A.    I don't believe anyone directed me to, but there was

3  going to be no question of me stealing anything, whether it be

4  drugs or money.

5  Q.    So you maintained this while working with Mr. Ojo to

6  ensure that you were never accused of stealing from Mr. Ojo?

7  A.    Correct.

8  Q.    Okay.  So up here where it says "start," what do you mean

9  by that when it says "2 balls" under it?  Can you just explain

10  what we are seeing kind of above that squiggly line?

11  A.    So the start, that must have been a day where he was not,

12  like, in the area, so that was what he would leave with me.  So

13  two balls would be seven grams of either cocaine or crack, and

14  two down would be two grams of heroin.

15  Q.    And then underneath there, I see what appears to be

16  initials CS, RL, and down here MK.

17        What are those referring to?

18  A.    Customers who came to buy.

19  Q.    Whose customers?

20  A.    Mr. Ojo's.

21  Q.    And were these -- at this point, you are not a source,

22  correct, in July of 2017?

23  A.    Correct.

24  Q.    Would these also be customers you helped serve?

25  A.    Yes.

1   Q.    On behalf of Mr. Ojo?

2   A.    Yes.

3   Q.    Just directing your attention, for example, to RL, and I

4   believe it says "Renee" next to it, who is that?

5   A.    Renee Lineberry.

6   Q.    And did you guys distribute to Renee Lineberry as well?

7   A.    Yes.

8   Q.    And then down here, it says the initials MK.

9         Who is that?

10  A.    Michael King.

11  Q.    Now, next to MK at the bottom, it says, EK owe 600 and

12  then paid.

13        What does that refer to?

14  A.    So he had owed Mr. Ojo $600, which that day that he came

15  to pick up from me, he paid that debt.  But I was told to give

16  him what he had asked for, so one and one, which would be a

17  gram of crack or coke and then a gram of heroin.  And now he

18  now owed $300.

19  Q.    Who told you to give Mr. King what he asked for?

20  A.    Mr. Ojo.

21  Q.    And when you said 600 was the debt he owed, what would

22  Mr. King have owed debt on?

23  A.    Drugs.

24  Q.    Now turning to page 2 of this document, it says, "MK gave

25  598."

```
 1           What does that mean?
 2   A.      I'm sorry.  I can't see it.
 3   Q.      I'm sorry.  It says, "MK gave 598."
 4           Do you see that, ma'am?
 5   A.      Yes.
 6   Q.      What does that refer to?
 7   A.      I guess he must have given me $598.
 8   Q.      Who is "he"?
 9   A.      "Mr. King."
10   Q.      And then there is additional information.  It says, MK,
11   CS, and ZS.
12           Do you see that?
13   A.      Yes.
14   Q.      And there is dollar figures next to them.
15           Do you see that?
16   A.      Yes.
17   Q.      And what do those dollar figures refer to?
18   A.      Debt people owed for drugs.
19   Q.      Now turning to page 3.
20           This is dated July 22nd of 2017.  Correct?
21   A.      Yes.
22   Q.      And that, again, is before you were a source.  Correct?
23   A.      Correct.  Correct.
24   Q.      And does this talk about the drug distribution you did on
25   Mr. Ojo on this date of July 22nd, 2017?
```

1  A.    Yes.

2  Q.    So what did you start with that day?

3  A.    I believe it says a ball, which is three-and-a-half grams

4  of coke or crack, and two grams of heroin.

5  Q.    And what refers to heroin on this page?

6  A.    The word "down."

7  Q.    And then at the bottom -- in the middle of the page,

8  there is a reference to Mikey.

9        Do you know who that is?

10 A.    That's Mr. King.

11 Q.    And it says here, "300 plus owe 300."

12       Is it fair to say Mr. Ojo would frequently give Mr. King

13 drugs on consignment?

14 A.    Yes.  He'd front them.

15 Q.    Now turning to page 5, ma'am.

16       Again, the date at the top of this is Monday, July the

17 4th.

18       Would that be 2017?

19 A.    Yes.

20 Q.    And now at the bottom, it says -- there is references to

21 paid D 80 at 12:40 p.m.; paid D 270.

22       What is that referring to?

23 A.    The date -- well, the time and obviously the date that I

24 gave Mr. Ojo the money that was made at that point that day.

25 Q.    And so you gave the money from the results of your sales

1   to Mr. Ojo?

2   A.     Yes.

3   Q.     And Mr. Ojo is referred to here as D?

4   A.     Correct.

5   Q.     And why would you give the money that you made to

6   Mr. Ojo?

7   A.     They were his drugs.

8   Q.     Why did you need to record when and how much you paid

9   Mr. Ojo?

10  A.     I was a severely strung-out addict and I did not want any

11  part of being accused of stealing either money or drugs.

12  Q.     Why not?

13  A.     Well, at one point, he thought I stole $200 from him or

14  lost it in drugs, whatever, and he took me by my hair out of

15  the driver's seat of my car, drug me into the back seat and out

16  of the vehicle right in front of my house.  He later found out

17  I did not steal it.

18  Q.     And so just flipping through this -- and I am not going

19  to go through every page here, but for the benefit of the jury,

20  I am just going to flip through -- this is all your

21  handwriting?

22  A.     Yes.

23  Q.     This is all during a time period when you were not a

24  source?

25  A.     Correct.

1    Q.    And all of the drugs and amounts and monies referred to
2    in this document, those were for Mr. Ojo's drug trafficking
3    business?
4    A.    Yes.
5    Q.    And just referring again to some dates that we just saw,
6    August 4th and August 5th, that would be of 2017.  Is that
7    correct?
8    A.    Correct.  This is all up until I became a source.
9    Q.    Because this ledger was seized from the car in which you
10   were arrested with Mr. Ojo's drugs.  Right?
11   A.    Correct.
12   Q.    You also referred to a number of pictures that you took
13   and provided to law enforcement.  Is that correct?
14   A.    I'm sorry.  Can you repeat that?
15   Q.    You also referred to pictures of drugs of Mr. Ojo's.  Is
16   that correct?
17   A.    Yes.
18   Q.    Okay.  And you took those pictures multiple times prior
19   to going to rehab.  Correct?
20   A.    Correct.
21   Q.    And that included in -- or do you recall any specific
22   time frame prior to rehab where you provided pictures to law
23   enforcement?
24   A.    Yes.
25   Q.    And when was that?

Brinkley - Cross

```
 1   A.    It was around Thanksgiving in 2017.
 2   Q.    I am going to show you what's been marked as MISC 11.
 3   It's a four-page document, ma'am.
 4         Do you recognize these?
 5   A.    Yes.
 6   Q.    What are they?
 7   A.    I'm sorry?
 8   Q.    What are they?
 9   A.    Pictures of how much those drugs weigh.
10   Q.    And whose drugs were these?
11   A.    Mr. Ojo's.
12   Q.    Do you recall where you took these pictures?
13   A.    I believe we were at the Extended Stay of America in
14   Frederick.
15   Q.    In Frederick?
16   A.    Yes.
17   Q.    And you said this was around Thanksgiving, so November of
18   2017?
19   A.    Correct.
20   Q.    What did you take these pictures on?
21   A.    My cell phone.
22   Q.    And where was Mr. Ojo when you took these pictures?
23   A.    He had stepped out.  He wasn't there.
24   Q.    Just looking at page 1, do you recall what were in either
25   of those two bags?
```

Butler - Cross

```
 1   A.    It's kind of hard to see, but I believe it is heroin and

 2   cocaine.

 3   Q.    And why is it on a scale?

 4   A.    To show the weight of it.

 5   Q.    And is that 7.2 grams?

 6   A.    Yes.

 7   Q.    Now turning to page 2.

 8         Do you recall what was in this picture?

 9   A.    I believe that's -- oh, yeah, I believe that's cocaine.

10   Q.    And approximately -- and why is it on a scale?

11   A.    To show the weight.

12   Q.    And was it 11 grams?

13   A.    Yes.

14   Q.    Now turning to page 3.

15         Do you recall what's contained in this bag in the

16   picture?

17   A.    I believe that's more cocaine.

18   Q.    And it's 113.3 grams of cocaine?

19   A.    Yes.

20   Q.    And now turning to page 4 of this exhibit.

21         Do you recognize this?

22   A.    Yes.

23   Q.    What is it?

24   A.    I believe it's heroin.

25   Q.    And it's 1 point -- 16.2 grams of heroin?
```

Bri - Peter - Cross

1   A.   Correct.

2   Q.   What happened to the drugs that we -- that you just took

3   photographs of that we reviewed?

4   A.   They were sold.

5   Q.   By who?

6   A.   Mr. Ojo.

7        THE COURT:  Just for timing purposes, how much longer

8   on cross?

9        MS. HAYES:  Your Honor, I have one more section, so I

10  believe it would be at least ten minutes.

11       THE COURT:  Okay.

12  BY MS. HAYES:

13  Q.   Now, you were asked questions about a controlled purchase

14  that you conducted for Mr. Ojo on July 16th of 2018.  Is that

15  correct?

16  A.   Yes.

17  Q.   And prior to that buy, had you arranged to get crack

18  cocaine and heroin from Mr. Ojo?

19  A.   Yes.

20  Q.   Do you recall how much you were originally expecting to

21  get from Mr. Ojo?

22  A.   I believe it was an ounce of cocaine or crack, I believe

23  it was crack, and some heroin.  I believe it was like a gram or

24  so.

25  Q.   And how many grams is in an ounce, if you know?

Bi-Peter - Cross

```
 1   A.      About 28.

 2   Q.      Twenty-eight?

 3   A.      Yes, ma'am.

 4   Q.      Did you ultimately get 28 grams of crack cocaine?

 5   A.      No.

 6   Q.      Do you remember why?

 7   A.      He didn't have it.

 8           MS. HAYES:  The Court's indulgence.

 9   BY MS. HAYES:

10   Q.      And had you previously seen Mr. Ojo with 28 grams of

11   crack cocaine in the house?

12   A.      I'm sorry.  Had I previously seen him with it?

13   Q.      Yes.

14   A.      Yes.

15   Q.      And would he distribute the more than 28 grams of crack

16   cocaine?

17   A.      Yes.

18   Q.      Did you see him with more than 28 grams of crack cocaine

19   at a single time?

20   A.      Yes.  I mean, we just saw a picture of 113 grams.

21   Q.      And was that cocaine or crack cocaine?

22           MR. OJO:  Objection, Your Honor.

23           THE WITNESS:  That was cocaine.

24           THE COURT:  Overruled.  Overruled.

25   BY MS. HAYES:
```

1   Q.    But specifically referring to crack cocaine, did you --
2   did you see him to have more than 28 grams of crack cocaine at
3   a time?
4   A.    Yes.
5   Q.    How many times?
6   A.    At least five.
7   Q.    And that was prior to you becoming a source.  Correct?
8   A.    Correct.
9   Q.    I am going to just briefly play what's been previously
10  marked as AB 9.
11        (Whereupon an audiotape was played in open court.)
12  BY MS. HAYES:
13  Q.    Do you recognize the two voices in that call?
14  A.    Yes.
15  Q.    Who are they?
16  A.    Myself and Mr. Ojo.
17  Q.    And, specifically, you were the female voice and Mr. Ojo
18  was the male voice?
19  A.    Yes.
20  Q.    And do you recall your reference to cooking?
21  A.    Yes.
22  Q.    What did that refer to?
23  A.    If he cooked the cocaine into crack.
24  Q.    And, ultimately, did you arrive in West Virginia?
25  A.    Yes.

Bri Peter - Cross

```
 1   Q.    And did you meet with law enforcement at a Lowe's in West
 2   Virginia prior to the buy?
 3             MR. OJO:  Objection.  Leading.
 4             THE COURT:  It's cross-examine.  She's allowed to.
 5   Overruled.
 6             MR. OJO:  She's allowed to lead?
 7             THE COURT:  It's cross-examination.  Yes.  Overruled.
 8             THE WITNESS:  Yes.
 9   BY MS. HAYES:
10   Q.    And were you searched?
11   A.    Yes.
12   Q.    Can you describe the search of your person, please?
13   A.    I mean, they checked everything, my pockets, felt me
14   down.  They checked my bra, my -- my thigh area.  Everything.
15   Q.    And when you say they checked your bra, was that inside
16   or outside your clothing?
17   A.    Like, was I strip searched?
18   Q.    Correct.
19   A.    No.
20   Q.    So was it outside of your clothing?
21   A.    Yes.  I mean, I had to physically take it and shake it.
22   Q.    Did you have any money or contraband that was not found
23   on you -- or that was not provided, sorry, to you by law
24   enforcement?
25   A.    No.
```

Bivens - Cross

1   Q.   And did that same search happen after the controlled buy?

2   A.   Yes, of both myself and my vehicle.

3   Q.   And at that time had you obtained drugs from Mr. Ojo?

4   A.   Yes.

5   Q.   What did you do with those drugs?

6   A.   I -- as soon as I left from purchasing them, I drove

7   right back to our meeting place and gave them directly over to

8   law enforcement.

9   Q.   And after you gave the drugs from Mr. Ojo over to law

10  enforcement, were you also searched again?

11  A.   Absolutely.

12  Q.   And did they find anything?

13  A.   No.  I wouldn't be here.

14  Q.   What would have happened if they had found extra money or

15  drugs on you?

16  A.   I would have been arrested.

17  Q.   Now, when you arrived at Mr. Ojo's apartment for the

18  controlled buy, was there any other individual that you

19  recognized that was out there?

20  A.   Yes.  There were two.

21  Q.   And did you recognize either or both of those individuals

22  at the time?

23  A.   Yes.

24  Q.   Who were they?

25  A.   One is Renee Lineberry, and the other, I believe her name

Britton - Cross

1  was Leslie.

2  Q.    And how did you know Leslie?

3  A.    She would buy from Mr. Ojo as well.

4  Q.    What would she buy from Mr. Ojo?

5  A.    Heroin.

6  Q.    Do you recall how long the actual controlled purchase

7  took that day?

8  A.    A while.

9  Q.    And why did it take so long?

10 A.    Because he wasn't ready when I got there.  He didn't have

11 -- there was some form of miscommunication, apparently.  He

12 didn't have what he told me he did, what we were planning to

13 purchase, and the cocaine was not yet cooked.

14 Q.    So the cocaine was not yet cooked?

15 A.    Correct.

16 Q.    While you were there, did Mr. Ojo cook the cocaine into

17 crack cocaine?

18 A.    Yes.

19 Q.    So I am going to show you what's been previously marked

20 as AB 2.

21        MS. HAYES:  And I am going to fast forward, Your

22 Honor, to 13 minutes and 42 seconds into the video.

23      (Whereupon a video was played in open court.)

24 BY MS. HAYES:

25 Q.    Pausing here at thirteen 49.

Bri - Peter - Cross

1       Who is in this photo -- or this video?

2   A.     Myself and his daughter.

3   Q.     That was Mr. Ojo's daughter?

4   A.     Yes.

5   Q.     Why did you come outside?

6   A.     He was cooking the crack.

7   Q.     Did Mr. Ojo also give you heroin that day?

8   A.     Yes.

9   Q.     What would you typically call heroin?

10  A.     Boy or down.

11  Q.     Following the controlled purchase on July 16th, 2018, did

12  Mr. Ojo reach out to you at all?

13  A.     Yes, the next day.

14  Q.     And why did he reach out to you?

15  A.     To see if the person I was purchasing for still wanted

16  the remainder of the ounce he did not have.

17  Q.     And who was that person you were purchasing for?

18  A.     His name was Brad.

19  Q.     And why did Mr. Ojo believe that you were purchasing this

20  crack cocaine and heroin for Brad?

21  A.     I mean, he had spoken to him himself before.

22  Q.     And is Brad an individual that law enforcement had

23  introduced you to in an effort to introduce Brad to Mr. Ojo?

24  A.     Yes.

25  Q.     Did Brad have a beard?

By Peter - Cross

1   A.    He did.

2              MS. HAYES:  The Court's indulgence.

3         No further questions, Your Honor.

4              THE COURT:  Redirect, Mr. Ojo.

5                    REDIRECT EXAMINATION

6   BY MR. OJO:

7   Q.    These are business Facebook record from 2018.  That says

8   1/12/2018.  1/12/2018.  I believe this is from FB -- maybe the

9   government can help.  These are the Facebook --

10             MS. COLLINS:  These are part of Government's Exhibit

11  FB 7.

12             THE COURT:  Thanks for assisting, Ms. Collins.

13             MR. OJO:  Thank you.

14  BY MR. OJO:

15  Q.    Can you see these -- these messages?  Do I need to zoom

16  in?

17  A.    I can see them.

18  Q.    This first one, do you see the date?

19  A.    Correct.  1/22/18.  I'm sorry.  1/12/18.

20  Q.    And that was during the time period where you were at

21  rehab.  Correct?

22  A.    I believe so, yes.

23  Q.    Just for the record, you stated earlier that while you

24  were in rehab, there is no social media; you are allowed two

25  calls.  Correct?

1  A.    No.  I was in sober living so I was allowed all of these

2  things.  I was not in an inpatient facility.

3  Q.    So there was no limitation on social media.  Correct?

4  A.    Correct.

5  Q.    But you were definitely in sober living in another state.

6  Correct?

7  A.    To the best of my knowledge, yes.

8  Q.    From, just for reminder's sake?

9  A.    December 2017 until about May 2018, I believe it was.

10  Q.    Perfect.

11        Do you see -- do you see this date that I am pointing to?

12  A.    Yes.  1/12/2018.

13  Q.    Can you read what this says?

14  A.    Sure.  "Okie Erick hit me for once he off work...I got

15  him, if U need me to."

16  Q.    So could you explain what that means?

17  A.    Absolutely.  So people, as you know, would hit me

18  sometimes in order to get in contact with you if you wouldn't

19  answer or whatever the case may be.  In this situation, he did.

20  He did not know I was in rehab, but I was basically letting you

21  know, like, hey, I can set whatever up, or, like, tell him to

22  call you, like, whatever you needed.

23  Q.    So that's what you meant by I got him if you need me to.

24  Correct?

25  A.    Yes.  Letting him know he can call you or deal with you.

1   Q.    And then do you -- can you read this message right here?

2   A.    Yes.  You said you were dropping her, which I assume is

3   Sharee, with her aunt.

4   Q.    Now, do you see this message that I am pointing to?

5   A.    Yes.  Yes.

6   Q.    Can you read the date on this message?

7   A.    1/13/18.

8   Q.    Can you read the message?

9   A.    "Can you still take me to Candace's."

10   Q.    Could you explain who you are talking to in these

11   messages?

12   A.    You.

13   Q.    Could you explain what you are asking or I am asking or

14   what the message is about?

15   A.    Obviously, my -- my timing is a little messed up.  I must

16   have left a little later than December, probably mid -- I

17   can't, like I said, give you the exact date.  I mean, it's been

18   so long.  Obviously, I was asking you to take me to Candace's.

19   Q.    Now --

20   A.    If you need them, I can get you the exact dates.

21   Q.    We just asked you a question.  I just wanted --

22         THE COURT:  Next question.  Next question.

23   BY MR. OJO:

24   Q.    So, now, it's a possibility that you were home during the

25   time period of December until May.  Correct?

Bennetter - Redirect

1  A.    I know for a fact you picked me up at the airport in May.

2  I was gone for -- I think when I testified, I was seven months

3  clean, so I was gone for at least six months.

4  Q.    So that would mean that you left after December?

5  A.    Yes.

6  Q.    So is it fair to say that you left in February?

7  A.    Like I said, I can't give you the exact month.

8  Q.    Do you need more messages to show you the time period

9  that you were home?

10  A.    No.

11  Q.    Okay.  So we are just going to say you are not sure when

12  you were really gone; is that fair to say?

13  A.    I cannot give you the exact starting date.  Like I said,

14  if you need it, I can get it.

15  Q.    Did the government inform you as to why they needed

16  information from you regarding Mr. Ojo's activity?

17        MS. HAYES:  Objection.

18        THE COURT:  Sustained.

19  BY MR. OJO:

20  Q.    Are you aware of why the government needed information

21  from you regarding Mr. Ojo's activities?

22  A.    Yes.

23        MS. HAYES:  Objection.  Leading.

24        THE COURT:  I will overrule as to leading.  She's

25  answered the question.  Next question.

Benjeter   Redirect

```
 1              THE WITNESS:  You were a drug dealer.
 2    BY MR. OJO:
 3    Q.    So they informed you that Mr. Ojo was a drug dealer and
 4    we need information?
 5    A.    No.  I informed them that you were a drug dealer because
 6    I was caught with your drugs.
 7    Q.    When you say you were caught with Mr. Ojo's drugs --
 8    A.    Mm-hmm.
 9    Q.    -- you were going to make a sale that you were not
10    getting paid for.  Correct?
11    A.    I would get paid in drugs, not cash.  Correct.
12    Q.    So on that day that you were caught with the drugs, who
13    were you meeting?
14    A.    Tanner Coke.
15    Q.    Who is Tanner Coke?
16    A.    He was one of your clients or our clients, however you
17    want to put it.
18    Q.    Where is he from?
19    A.    Damascus.  I believe you went to high school with him.
20    Q.    You said that it was convenient for you to deal with
21    Mr. Ojo personally because you guys lived close by.  Correct?
22    A.    Correct.
23    Q.    So that day when you met Mr. Ojo, did you go into the
24    house?
25    A.    The first day I met you?
```

Bentler - Redirect

1   Q.    Yes.

2   A.    No.  You came out.

3   Q.    So do you remember roughly what the amount of drugs were

4   being pressed?  It doesn't have to be exact.  I am just saying

5   roughly, a rough amount.  What --

6   A.    That you were giving Mr. King?

7   Q.    Yes.

8   A.    At least a gram of crack or coke and at least a gram of

9   dope.  I mean, I don't remember exactly.  We wouldn't have made

10  the trip for less, though.

11  Q.    So Mr. Ojo came out of the house and did what?

12  A.    Got into my vehicle.

13  Q.    Mm-hmm.

14  A.    And I -- if I remember correctly, we -- you then gave

15  them to Brittney Seal, you got out, went back in the house, and

16  we left.

17  Q.    Do you recall any police vehicles that live in that

18  cul-de-sac with Mr. Ojo?

19  A.    Of course.

20  Q.    Do you recall around what time of day this event took

21  place?

22  A.    Before two p.m.

23  Q.    So what you are saying is that in broad daylight, Mr. Ojo

24  came out, got in your car, and sold drugs right there in the

25  cul-de-sac?

1   A.    It's a parking lot, not a cul-de-sac, A.  Yes.  And B,

2   our development has the most Montgomery County Police officers

3   living in it, so they were your neighbors.  Yes.

4   Q.    So what you are saying is that there is a lot of police

5   in -- in -- in our neighborhood?

6   A.    At least their cruisers, yes.  Whether they were

7   physically there or not, I don't know.

8   Q.    But we are assuming that they lived there?

9   A.    Right.  But they could also have personal vehicles so I

10  don't know if they were home.

11  Q.    Right.  So I guess what I am trying to get an

12  understanding of is that even with police living in the area,

13  Mr. Ojo still freely came outside and did a transaction?

14  A.    Absolutely.

15  Q.    While Mr. Ojo was living with you, did Mr. Ojo freely

16  come outside and do any transactions over there?

17  A.    Yes.

18  Q.    Yes?

19  A.    Yes.

20  Q.    So who else was living with you and Mr. Ojo?

21  A.    My mother.

22  Q.    Is that the owner of the house?

23  A.    Absolutely.

24  Q.    Is she a Montgomery County Police?

25  A.    She's parole and probation.

Benteler - Redirect

1    Q.    Now, when you say that Mr. Ojo would come outside and do

2    transactions freely, were you also coming outside and doing

3    transactions freely?

4    A.    Absolutely.

5    Q.    So people were free to see everything that was going on?

6    This wasn't hidden? This was just out in the open?

7    A.    Did they know exactly what we were doing? No. As you

8    know, I live in a cul-de-sac, and most of the time, it is

9    empty. My mother is a single mom. She works two jobs. She

10    was rarely home. So we had free run to do what we wanted. So

11    yes.

12    Q.    Okay. So when you say "she was rarely home," is there a

13    specific time that she would get home from work?

14    A.    Absolutely. She'd maybe get home around, from her first

15    parole and probation job, maybe around two to change literally

16    for maybe 15 minutes and go to her second job. She would then

17    get home maybe around 11 p.m.

18    Q.    So during that time period, was it -- was it fair to say

19    that Mr. Ojo would be gone or wouldn't be around at all?

20    A.    I'm sorry. What do you mean by that?

21    Q.    Was Mr. Ojo always at the house?

22    A.    A lot of the time, yes. Towards the end, no, you would

23    -- you rented a vehicle and you would be doing things because

24    the baby was about to be born.

25    Q.    Now, how do you know where Mr. Tanner Coke went to

1   school?

2   A.     Tanner Coke?

3   Q.     Tanner Coke.

4   A.     Damascus is a small town and I went to high school with

5   his sister.

6   Q.     You went to high school with his sister?

7   A.     Mm-hmm.  Yes.

8   Q.     Where did you meet Mr. Coke or Cock or --

9   A.     At his house on 108 when you went to sell him drugs.

10  That was the first time I have ever seen him.

11  Q.     At his house on 108?

12  A.     108 in Damascus, yes.

13  Q.     Could you explain to us where that is exactly?

14  A.     I don't understand.

15  Q.     Compare --

16  A.     Compared to where we were living?

17  Q.     Yeah.

18  A.     Ten-minute drive.

19  Q.     Okay.  Which direction?  Where --

20  A.     I don't know if it's east, north, whatever it is, but

21  it's towards Laytonsville.

22  Q.     Towards Laytonsville?

23  A.     Correct.

24  Q.     Now, again, just to refresh my memory, exactly what date

25  was this or roughly what date was this?

Bennett - Redirect

1    A.      You know, I don't recall.

2            THE COURT:  Just for timing purposes, how much longer

3    do you think you have?

4            MR. OJO:  I have about 20 minutes.

5            THE COURT:  Keep going.

6    BY MR. OJO:

7    Q.      Do you recall telling Ms. Lineberry that you would take

8    her to Baltimore to buy drugs?

9    A.      At any point that I have known her, yes.

10   Q.      I mean around the time of these messages that I just

11   showed you.

12   A.      I do not.

13   Q.      Do you recall stating that when you get mad at Mr. Ojo,

14   you just take people to Baltimore?

15   A.      No.

16   Q.      You don't recall saying that?

17   A.      I mean, I may have.  But there is a difference between

18   saying it and doing it.

19   Q.      So when you say "there is a difference between saying it

20   and doing it," do you mean that these Facebook messages and

21   these messages could just be someone angrily saying stuff?

22   A.      I am referencing what you just asked me, if I told her I

23   would take her to Baltimore.  As you know, the people we sold

24   to, a lot of them had been your previous girlfriends as well

25   and I knew things would get back to you, especially that

Bruetter - Redirect

1  comment.  So for that comment, yes, I could have been angry and

2  just said it.

3  Q.     So, like I said, some of these messages that are on

4  Facebook could just be out of anger or someone just typing for

5  whatever reason.  Correct?

6  A.     I mean, I can only speak to what I write.

7  Q.     Fair enough.

8         You said that when you go to Baltimore with Mr. Ojo, that

9  you never -- never spent less than $1500.  Correct?

10  A.     Yes.  Either that or we picked up on credit, so yes.

11  What I meant by that was the quantity we got was never a 50

12  bag.  It was at least $1500 or more.

13  Q.     Now, do you know who Mr. Ojo was meeting?

14  A.     I know a few of them.

15  Q.     Oh, you know a few of them?

16  A.     I mean, I have seen them with you, so if you can give me

17  a day or a roundabout time or location, I can tell you.

18  Q.     How did you contact the people that you went down there

19  and met?

20  A.     I don't understand.  I met them with you.  These were

21  your people so I did not have contact information.

22  Q.     Had you met Mr. Seabolt?

23  A.     Who?

24  Q.     Do you know anyone named Mr. Seabolt?

25  A.     No, I don't.  I know someone named Sea, not Seabolt.

```
 1   Q.    Are you aware of anyone who may have a vendetta with

 2   Mr. Ojo?

 3   A.    No.

 4              MR. OJO:  No further questions.

 5              THE COURT:  Ma'am, thank you for your testimony.

 6   Please don't discuss your testimony with anyone until the trial

 7   has been completed.  You are excused.  Enjoy the rest of your

 8   day.

 9              THE WITNESS:  Thank you.

10              THE COURT:  You're welcome.

11         Mr. Ojo, is that your last witness?

12         Ladies and gentlemen, let's take our morning break at

13   this point.  I will ask that you be back in the jury room in

14   about 15 minutes and we will be ready to go from there.

15   Remember not to discuss this case with anyone, including even

16   among yourselves.

17         (The jury panel exit the courtroom at 11:26 a.m.)

18              THE COURT:  You can be seated unless addressing the

19   Court.

20         Mr. Ojo, do you have another witness?

21              MR. OJO:  There is no other witness.

22              THE COURT:  All right.  Very well.  So then when we

23   get back from the break, I am going to have you rest in front

24   of the jury.

25         Do you want to renew your motion for judgment of
```

1  acquittal?

2       MR. OJO:  I do, Your Honor.  There is evidence that

3  I'd like to show in regards to the warrant application that we

4  spoke of.

5       THE COURT:  So it's been admitted in the trial?

6       MR. OJO:  Yes.

7       THE COURT:  You can just tell me about it.  I don't

8  know that you need to show me.  But I will hear you if you want

9  to make argument.

10      MR. OJO:  Yeah.  The actual Sprint Nextel data that

11 CAST -- the CAST member came to -- to testify about --

12      THE COURT:  The cell site guy?

13      MR. OJO:  Mr. Fowler.  It states that in 2021 was the

14 effective date of the warrant; yet, in the warrant application,

15 it states that Mr. Walsh viewed those same records in order to

16 get the application for the Facebook messages.

17      Now, significantly, he we spoke about false information

18 in the warrant application, and one of the issues was whether

19 or not Mr. Walsh actually corroborated the -- the information

20 that he was given.

21      Now, with all respect, though, the government has showed

22 evidence of other stuff, other evidence.  There was still the

23 issue of when Mr. Walsh actually had the information in regards

24 to the Facebook -- I mean the tracking location.

25      THE COURT:  For the purpose of obtaining the Facebook

1    records?

2            MR. OJO:  Yes.

3            THE COURT:  Okay.  I am following you.

4            MR. OJO:  Now, the CAST information, though, it shows

5    time -- stamped on time, realtime information, it wasn't

6    provided until 2021.  So I am unsure of how Mr. Walsh was able

7    to gather that information in his warrant application.  That

8    warrant application for Facebook was in 2018, particularly --

9    exactly 5 -- I mean 2/5/18.  So there seems to be a

10   contradiction in the testimony or the affidavit and the actual

11   information.

12           Further, you referenced several -- you as well as the

13   prosecution referenced several 403 violations.  Now --

14           THE COURT:  I referenced violations or you are saying

15   I made them?  I am just trying to follow.

16           MR. OJO:  I'm sorry.  You referenced 403.

17           THE COURT:  Okay.

18           MR. OJO:  As in when you were asking about I believe

19   it was why they showed the video of the 7 -- the July 2018 buy

20   since I wasn't being charged for it.  I think that's when you

21   may have referenced it.

22           THE COURT:  I remember making a comment about them

23   showing the same thing over and over again, but continue with

24   your point.

25           MR. OJO:  So that was literally the basis of my

1    argument, and the exclusion of evidence in my exclusion motion

2    was relevance, and you denied that.  So I would like to renew

3    based on some of that information that prejudiced me.  The jury

4    was able to see a lot of this information, and Mr. Walsh

5    clearly -- I am not sure if he omitted something or if he lied,

6    I am not sure what to call it exactly, but there was definitely

7    misrepresentation as to actual tracker location data that he --

8    that he viewed.

9           Also, the *Brady* material.  Though Ms. Billeter was here,

10   there was still no informing of her status as a disbarred

11   agent, paid informant.  I believe that would have made a little

12   bit of difference.  In preparation, that would have changed the

13   suppression issues a little bit.  That would at least have

14   given way to information that would have influenced the

15   defense.

16          And also the initial denial of the Rule 29 motion, you

17   stated that just by the facts of the case, but at the time, the

18   instruction or the rule about conspiracy solely with government

19   agents were not part of those facts.

20          So, for those reasons, I ask, along with several others,

21   for acquittal on some of those issues.

22              THE COURT:  All right.  So I have heard argument from

23   the defendant on the issue.  I am not going to solicit a

24   response and I am not going to address every point because the

25   majority, with the exception of the one point at the end, the

1  majority of what was argued doesn't go to a motion for a

2  judgment of acquittal.  He still seems to be re-litigating past

3  suppression motions.  He may decide to file a motion for

4  reconsideration.  He might, I am confident, if this doesn't go

5  well for him, file an appeal with the Fourth Circuit, but I

6  have ruled on those issues.

7       I will just note as an example, because it may or may not

8  be useful in terms of closing arguments, you know, just as one

9  example, the -- whether or not the Walsh affidavit or any

10 affidavit -- I know there was questioning, lengthy questioning

11 in trial about how he corroborated it in his affidavit.  It's

12 just -- I am just making the observation that the purpose of

13 the affidavit is to get whatever records he was seeking to get.

14 I think specifically we are talking about Facebook records.

15      I have, to the extent motions were filed, made decisions

16 that, at least the affidavits that were challenged before

17 trial, were sufficient.  I have made that ruling.

18      In trial, what we are here to now decide is whether the

19 evidence, at least what I am deciding right now, is sufficient,

20 taken as a whole, to go to the jury, not whether, on whatever

21 date Agent Walsh filed his affidavit, he, at that moment, had

22 sufficient corroboration.  I have made that decision.

23      The decision now is what does the jury have?  And so I

24 recognize that, and you can preserve some of those arguments,

25 but the issue before me now is whether or not there is enough

1   evidence, if accepted by a jury, to -- to support conviction on

2   each of the charged counts.

3       I will note that there was some commentary there about

4   *Brady* material particular to her no longer being a informant of

5   the federal government and the potential reasons for that.  To

6   the extent -- I am not saying there was any violation, but even

7   if there was, the information came out in court and the jury

8   now has that information.

9       Finally, the last point I will make, because I think it's

10  the only point, and I was listening and jotting notes, the only

11  point that was made that I think is actually relevant to the

12  pending motion, the motion I am considering right now, is the

13  argument regarding a government agent -- specifically whether

14  or not the charged conspiracy involved something other than you

15  dealing with a government agent.

16      As I indicated before, at the very least, Mr. King was

17  not a government agent at the time that he was alleged to have

18  been dealing with you.  There was just testimony that

19  Ms. Billeter, at times, at least at certain times was not a

20  government agent while she was dealing with you.

21      If those things are accepted by the jury, I find that

22  that -- that that is sufficient.  Whether they believe that or

23  not is up to the jury, but I do find that it's sufficient.

24      So then going back to the actual charges, there are four

25  controlled buys, which were Counts Two through Five.  There was

1    evidence of those controlled buys that, if accepted by a jury,

2    is sufficient.

3         There was, regarding Count Six, evidence of items

4    recovered from you during a traffic stop.  If believed by a

5    jury, that's sufficient.

6         And then as to conspiracy, there has been significant

7    testimony from any number of individuals, including, frankly,

8    just what we heard just now, that would be sufficient with

9    which, I can't emphasize this enough, if believed by a jury --

10   I am not saying whether they should or they shouldn't -- but,

11   if believed by a jury, enough to make out the elements of

12   conspiracy.

13        So I find that the government has provided enough

14   information that if the jury accepts it, it provides a

15   sufficient basis to convict.

16        Again, you have raised a number of issues just now that I

17   have ruled upon in the past that may, if you decide to file a

18   motion for new trial -- I probably shouldn't be giving you

19   suggestions to give me more work for later -- but if you feel

20   you want to have me reconsider those things, there might be

21   opportunities to do so.  But right now, I am ruling on a motion

22   for judgment of acquittal, and your motion is denied.

23        Is there going to be a rebuttal case from the government?

24             MS. HAYES:  The Court's indulgence.

25             MS. COLLINS:  Your Honor, there is not a rebuttal

1   case.

2        I would ask, Your Honor, since the defendant raised

3   several issues, and I agree I don't think they go to Rule 29,

4   but there were some issues that were raised that you noted

5   there might be an appeal, and I'd like to clarify the record.

6              THE COURT:  That's fair.  Try to do it briefly.

7              MS. COLLINS:  Yes, Your Honor.  First, he referred to

8   the --

9              THE COURT:  Again, you can keep your mask on if you

10  want, but --

11             MS. COLLINS:  I apologize.

12             THE COURT:  I just want to make sure you didn't

13  forget.

14             MS. COLLINS:  I do forget sometimes, yes.

15       He referred to the Sprint GPS tracking data, and I think

16  the defendant made some statements that it was from 2021.  I

17  want to be clear there are certifications, business records

18  certifications from 2021.  That data was provided in 2018

19  pursuant to search warrants that have been discussed at length

20  at trial, but there is no evidence the data was from 2021 or

21  was produced in 2021.

22       And then with respect to the -- the issue of the

23  disclosure that Ms. Billeter was -- was terminated as a source,

24  I just want to be clear that was disclosed before trial by the

25  government in -- although we had determined not to call her as

1   a witness, out of an abundance of caution, we did disclose that

2   with our *Jencks* letter, so it was disclosed to him, you know, a

3   week before trial.

4            MR. OJO:  Just for clarification, I didn't say that

5   she was an agent.  I said that she was no longer an agent

6   because she was under investigation for drug trafficking.  I

7   didn't say that they didn't tell me she was an agent.  I knew

8   she was an agent.  That's why I was calling her as a witness

9   throughout the whole trial.

10           MS. COLLINS:  To clarify, what I am saying is that a

11  week before trial, we disclosed that in April 2021, she was

12  closed as a source by her FBI handlers after they became aware

13  of ongoing unauthorized illegal activity.  So that was

14  disclosed.

15           THE COURT:  The record -- the record is clear --

16  Mr. Ojo, I just want to note that Mr. Hall -- he certainly

17  hasn't asked me to say this -- has gone above and beyond what

18  any standby counsel I have ever seen has done.  I am just going

19  to note that.

20           MR. OJO:  I am not disputing that.

21           THE COURT:  I am just noting that.

22           MR. OJO:  I just wanted to clarify that --

23           THE COURT:  I am just noting that.  I am done.  I am

24  done.

25           All right.  Anything else?  Anything else at this point?

1    If not, when I come back -- so I will instruct and then we will

2    go to lunch.  There is no way we will get to closings, but when

3    I come back, I will instruct and we will go from there.

4              MS. HAYES:  Thank you, Your Honor.

5         And just to clarify, and I apologize if Your Honor said

6    this earlier, but you did get the revised jury instruction

7    regarding the adding a paragraph?

8              THE COURT:  There was a paragraph -- I got that.  I

9    put it in.  It's in there.

10             MS. HAYES:  Thank you, Your Honor.

11             THE COURT:  You can double check during the break but

12   I think it's in there.

13        Anything else?

14             MS. COLLINS:  No, Your Honor.

15             THE COURT:  See you after break.  15 minutes.  Ten

16   more minutes.

17        (Recess taken from 11:42 a.m. until 11:57 a.m.)

18             THE COURT:  Please be seated.

19        So I did realize that paragraph was not in there.  It's

20   in there now.  So I apologize for that oversight.  And I killed

21   a bunch more trees printing out new copies even though that was

22   the only change I made, so if you want that...

23             MS. COLLINS:  Thank you.

24             THE COURT:  It says of the United States still on the

25   title.  Obviously, that's not how it will look when it goes

1    back to the jury.

2         Anything else before I bring the jury back for

3    instructions?

4              MS. HAYES:  Your Honor, if we could just have five

5    more minutes to consult with Mr. Hall?

6              THE COURT:  Sure.

7         (Pause.)

8              THE COURT:  If there is any chance that what I am

9    overhearing is actually going to be productive, I will step out

10   and give you another five minutes, but I have no idea.

11             MR. HALL:  I don't know.  I have no idea either, Your

12   Honor.

13             THE COURT:  I will just let you continue.  I won't

14   interrupt then.

15             MR. OJO:  I am trying to make it productive.  That's

16   why I am asking the questions.

17             THE COURT:  That's fine.  That's fine.

18        (Pause.)

19             THE COURT:  I want to be clear I am not -- I am

20   inquiring for the purposes -- let me say this first:  I am just

21   inquiring -- I want to be really, really clear, I am not

22   getting involved -- is whatever has been exchanged something

23   that's going to expire in 30 seconds, or can I instruct the

24   jury first, and if there need to be other discussions, they can

25   happen at the lunch break?  And you can answer that either way.

1   I am not pushing you.  I just want to know if I can instruct

2   the jury while we have them?

3              MS. HAYES:  Your Honor, the government would have no

4   objection moving forward with instructions and potentially

5   having continued conversations after.

6              THE COURT:  There won't be a change in position

7   between now and when I finish instructing?

8              MS. HAYES:  Correct, Your Honor.

9              THE COURT:  That's all I want to know.  So can I

10  instruct the jury now and whatever is happening -- okay.  Let's

11  get the jury.  I am just looking at the time and I want to try

12  to get this done before lunch.

13             MR. HALL:  That makes sense, Your Honor.

14             THE COURT:  And I will just point out really quickly

15  there might be a couple at the end that I wait until after

16  argument to finish.  Like, verdict form and right to see

17  exhibits, I will tell them after closings.  Everything else, I

18  will get through now.

19        (The jury panel enter the courtroom at 12:02 p.m.)

20             THE COURT:  Everyone may be seated.

21        Mr. Ojo, any additional witnesses?

22             MR. OJO:  No.  No, Your Honor.

23             THE COURT:  Does the defense rest?  Does the defense

24  rest?

25             MR. OJO:  Oh, yes, Your Honor.

1          THE COURT:  Does the government have a rebuttal case?

2          MS. COLLINS:  No, Your Honor.

3          THE COURT:  So, ladies and gentlemen, that means the

4   evidence in the case is now concluded, which means it is time

5   for me to give my instructions to you on the law.  I did not

6   time myself reading these.  If it gets too far passed 1:00, we

7   will break for lunch and finish after lunch.  I try not to

8   speed read as much as I would like to get through them before

9   lunch, so we will just sort of see where we land.

10          One thing I like to point out at the very beginning, you

11   are free to take notes certainly if that helps you, but I want

12   you to know you will get written copies of these jury

13   instructions so you shouldn't feel the need to take dictation

14   as I sit up here, but certainly if you want to highlight things

15   in your notes, that's perfectly fine.

16          So, ladies and gentlemen, you are about to enter your

17   final duty, which is to decide the fact issues in this case.

18   Before you do that, I am going to instruct you on the law.  You

19   must pay close attention to me now.  I will go as slowly as I

20   can and be as clear as possible.

21          I told you at the very start of the trial that your

22   principal function during the taking of testimony would be to

23   listen carefully and observe each witness who testified.  It

24   has been clear that up to now, you have faithfully discharged

25   your duty to listen carefully and observe each witness who

1    testified.  I ask you to give me that same careful attention as

2    I instruct you on the law.  You will receive a written version

3    of these instructions to take in the jury room, so take notes

4    only if you find that helpful.

5         You have now heard all of the evidence in this case and

6    you will soon hear the final arguments of counsel for the

7    government and by the defendant.

8         My duty at this point is just to instruct you as to the

9    law.  It is your duty to accept these instructions of law and

10   apply them to the facts as you determine them, just as it has

11   been my duty to preside over the trial and decide what

12   testimony and evidence is relevant under the law for your

13   consideration.

14        On these legal matters, you have to take the law as I

15   give it to you.  If any attorney or the defendant states or has

16   stated a legal principle that's different from what I say to

17   you in my instructions, it is my instructions that you have to

18   follow.

19        You should not single out any instruction as alone

20   stating the law, but consider my instructions as a whole when

21   you retire to deliberate in the jury room.

22        You should not, any of you, be concerned about the wisdom

23   of any rule that I state.  Regardless of any opinion that you

24   may have as to what the law may be, or ought to be, it would

25   violate your sworn duty to base a verdict upon any other view

1   of the law other than that which I am giving to you.

2          Your final role is to pass upon and decide the fact

3   issues that are in this case.  You, the members of the jury,

4   are the sole and exclusive judges of the facts.  You pass upon

5   the weight of the evidence; you determine the credibility of

6   the witnesses; you resolve such conflicts as there may be in

7   the testimony; and you draw whatever reasonable inferences you

8   decide to draw from the facts as you have determined them.

9          I will discuss with you later how to pass upon the

10  credibility or believability of the witnesses.

11         In determining the facts, you must rely upon your own

12  recollection of the evidence.  What the lawyers or the

13  defendant have said in their opening statements, what they will

14  say in their closing arguments, what they will say or have said

15  in their objections, or in their questions is not evidence.  In

16  this connection, you should bear in mind that a question put to

17  a witness is never evidence.  It is only the answer that is

18  evidence.  Nor is anything that I may have said during the

19  trial or may say during these instructions with respect to a

20  fact matter to be taken in substitution for your own

21  independent recollection.  What I say or anything I have said

22  is not evidence.

23         The evidence before you consists of the answers given by

24  witnesses, the testimony they gave, as you recall it, and the

25  exhibits that were received in evidence.

1          The evidence does not include questions.  Only the
2    answers to the questions are evidence.  But you may not
3    consider any answer that I directed you to disregard or that I
4    directed struck from the record.  Do not consider such answers.
5          Since you are the sole and exclusive judges of the facts,
6    I do not mean to indicate any opinion as to the facts or what
7    your verdict should be.  Any rulings I have made or discussion
8    with counsel or the defendant during the trial are not any
9    indication of my views of what your decision should be as to
10   whether or not the guilt of the defendant has been proven
11   beyond a reasonable doubt.
12         I ask you to draw no inference from the fact that upon
13   occasion, I may have asked questions of certain witnesses.  To
14   the extent I did that, the questions were only intended for
15   clarification or to expedite matters and were not intended to
16   suggest any opinions on my part as to the verdict you should
17   render or whether any of the witnesses may have been more
18   credible than any other witness.  You are expressly to
19   understand that I, as the Court, have no opinion as to the
20   verdict you should render in this case.
21         As to the facts, ladies and gentlemen, you are the
22   exclusive judges.  You are to perform the duty of finding the
23   facts without bias or prejudice to any party.
24         I remind you that before each member of the jury was
25   accepted and sworn to act as a juror, he or she was asked

1    questions concerning competency, qualifications, fairness, and

2    freedom from prejudice and bias.  On the basis of those

3    answers, you were accepted as a juror by the Court and the

4    parties.  Those answers are as binding on each of you as they

5    were then and will be until you are discharged from

6    consideration of this case.

7         You are to perform the duty of finding the facts without

8    bias or prejudice as to any party.  You are to perform your

9    final duty in an attitude of complete fairness and

10   impartiality.

11        This case is important to the government for the

12   enforcement of criminal laws is a matter of prime concern to

13   the community.  Equally, it's important to the defendant who is

14   charged with serious crimes.

15        The fact that the prosecution is brought in the name of

16   the United States of America entitles the government to no

17   greater consideration than that afforded to any other party to

18   a litigation.  By the same token, the government is entitled to

19   no less consideration.  All parties, whether government or

20   individuals, stand as equals at the bar of justice.

21        It is the duty of the attorney for each side of a case or

22   the defendant who has elected to represent himself to object

23   when the other side offers testimony or other evidence that the

24   attorney or defendant believes is not properly admissible under

25   the rules of evidence.  Counsel and, in this case, the

1   defendant also have the right and the duty to ask me to make

2   rulings of law and to request conferences at the sidebar out of

3   the hearing of the jury.  All of those questions must then be

4   decided by me, since they are issues of law, the Court.  You

5   should not show any prejudice against any party because the

6   party objected to the admissibility of evidence or asked for

7   conferences outside of the hearing of the jury or asked me to

8   make a ruling on the law.

9        As I already indicated, my rulings on the admissibility

10  of evidence do not indicate any opinion at all about the weight

11  or the effect of such evidence.  You are the sole judges of the

12  credibility of all witnesses and the weight and effect of all

13  evidence.

14       The defendant has represented himself in this trial.  He

15  has a constitutional right to do that.  His decision has no

16  bearing on whether he is guilty or not guilty, and it may not

17  affect your consideration of the case.  Because the defendant

18  has decided to act as his own lawyer, you have heard him speak

19  at various times during the trial.  He made an opening

20  statement and he may make a closing argument.  He asked

21  questions of witnesses, he made objection, and argued to the

22  Court.  I want to remind you that when the defendant spoke in

23  these parts of the trial, he was acting as a lawyer in the case

24  and so his words are not evidence.  The only evidence in this

25  case came from witnesses who testified under oath on the

1    witness stand and from exhibits that were admitted into

2    evidence.

3         Although the defendant chose to represent himself, the

4    Court did appoint Marc G. Hall to assist the defendant as

5    standby counsel.  To the extent Mr. Hall might have spoke a

6    couple times, his words were not evidence either.

7         Your verdict must be based solely upon the evidence

8    developed at trial or the lack of evidence.

9         It would be improper for you to consider, in reaching

10   your decision as to whether the government sustained its burden

11   of proof, any personal feelings you may have about the

12   defendant's race, religion, national origin, sex, or age.  All

13   persons are entitled to the presumption of innocence and the

14   government has the burden of proof.

15        It would be equally improper for you to allow any

16   feelings you might have about the nature of the crimes charged

17   to interfere with your decision-making process.

18        Your verdict, again, must be based exclusively upon the

19   evidence or the lack of evidence in the case.

20        Under your oath as jurors, you are not to be swayed by

21   sympathy.  You are to be guided solely by the evidence in this

22   case, and the crucial, hard-core question that you must ask

23   yourselves as you sift through the evidence is:  Has the

24   government proven the guilt of the defendant beyond a

25   reasonable doubt?

1          It is for you alone to decide whether the government has

2     proven the defendant is guilty of the crimes charged solely on

3     the basis of the evidence and subject to the law as I instruct

4     you.   It must be clear to you that once you let fear or

5     prejudice or bias or sympathy interfere with your thinking,

6     there is a risk that you will not arrive at a true and just

7     verdict.

8          If you have a reasonable doubt as to the defendant's

9     guilt, you should not hesitate for any reason to find a verdict

10     of acquittal.   But on the other hand, if you should find that

11     the government has met its burden of proving the defendant's

12     guilt beyond a reasonable doubt, you should not hesitate

13     because of sympathy or any other reason to render a verdict of

14     guilty.

15          You are about to be asked to decide whether or not the

16     government has proven beyond a reasonable doubt the guilt of

17     the defendant before you.   You are not being asked whether any

18     other person has been proven guilty.   Your verdict should be

19     based solely upon the evidence or lack of evidence as to the

20     defendant that's before you, in accordance with my instructions

21     and without regard to whether the guilt of other people has or

22     has not been proven.

23          During your deliberations, you should not discuss or

24     provide any information about the case with anyone.   This

25     includes discussing the case in person, in writing, by phone or

1    by any electronic means, via text messaging, email, Facebook,

2    LinkedIn, Twitter, blogging, or any Internet chat room,

3    website, or other feature.  Do not talk to anyone on the phone

4    or in person, correspond with anyone, or communicate by

5    electronic means about this case with anyone except your fellow

6    jurors and only then while you are in the jury room once

7    deliberations have begun.

8        If you are asked or approached in any way about your jury

9    service or anything about this case, you should respond that

10   you have been ordered by the judge not to discuss the matter

11   and you should report that contact to me as soon as possible.

12       Along the same lines, you should not try to access any

13   information about this case or do research on any issue that

14   arose during the trial from any outside source, including

15   dictionaries, reference books, or anything on the Internet.

16   Information that you may find on the Internet or any printed

17   reference might be incorrect or incomplete.  In our court

18   system, it's important that you not be influenced by anyone or

19   anything that's outside of this courtroom.  Your sworn duty is

20   to decide this case solely and wholly on the evidence presented

21   to you in this courtroom.

22       Although the defendant has been indicted, you must

23   remember that an indictment is only an accusation.  It is not

24   evidence.  The defendant has pled not guilty to the charging

25   document, which is formally referred to as the second

1    superseding indictment.

2        As a result of the defendant's plea of not guilty, the

3    burden is on the prosecution to prove the defendant's guilt of

4    each element of the crimes charged beyond a reasonable doubt.

5    This burden never shifts to the defendant for the simple reason

6    that the law presumes a defendant to be innocent until proven

7    guilty and never imposes upon the defendant in a criminal case

8    the burden or duty of calling any witnesses or producing any

9    evidence.

10       The law presumes the defendant to be innocent of all the

11   charges against him.  I therefore instruct you that the

12   defendant is to be presumed by you to be innocent throughout

13   your deliberations until such time, if ever, you, as a jury,

14   are satisfied that the government has proven the defendant

15   guilty beyond a reasonable doubt.

16       The defendant begins the trial with a clean slate.  This

17   presumption of innocence alone is sufficient to acquit the

18   defendant unless you, as jurors, are unanimously convinced

19   beyond a reasonable doubt of the defendant's guilt after a

20   careful and impartial consideration of all the evidence in the

21   case.  If the government fails to sustain its burden on any

22   charge as to the defendant, you must find the defendant not

23   guilty as to that charge.

24       This presumption was with the defendant when the trial

25   began and remains even now as I speak to you and will continue

1    with the defendant into your deliberations unless and until you

2    are convinced that the government has proven the defendant's

3    guilt beyond a reasonable doubt.

4         In deciding whether or not the government has met its

5    burden of proof, you may consider both direct evidence and

6    circumstantial evidence.

7         Direct evidence is evidence that proves a disputed fact

8    directly.  For example, when a witness testifies to what he or

9    she saw, heard, or observed, that's called direct evidence.

10        Circumstantial evidence is evidence that tends to prove a

11   disputed fact by proof of other facts.  To give a simple

12   example, suppose that when you came into the courthouse today

13   the sun was shining and it was a nice day.  The courtroom door

14   is closed and you can't look outside and you just have some

15   small windows up there that you can't see from where you are

16   sitting.  Then later, as you were sitting here, someone walked

17   in with a dripping wet umbrella, and soon after that, somebody

18   else walked in with a dripping wet raincoat.  Now, on our

19   assumed facts, you couldn't look outside the courtroom and you

20   can't see for yourself whether or not it is raining, so you

21   have no direct evidence that it's been raining.  But on the

22   combination of the facts about the umbrella and the raincoat,

23   it would be reasonable for you to infer that it had begun to

24   rain.

25        That's all there is to circumstantial evidence.  Using

1  your reason and experience, you infer from established facts

2  the existence or non-existence of some other fact.  Please note

3  that this is not a matter of speculation or guess.  It is a

4  matter of logical inference.

5       The law makes no distinction between direct and

6  circumstantial evidence.  Circumstantial evidence is of no less

7  value than direct evidence, and you may consider either or

8  both, and may give them such weight as you conclude is

9  warranted.

10      The evidence in this case consists of the sworn testimony

11 of the witnesses and the exhibits received in evidence.

12      Exhibits which have been marked for identification but

13 not received into evidence may not be considered by you as

14 evidence.  Only those exhibits received into evidence may be

15 considered as evidence.

16      Similarly, you are to disregard any testimony that I have

17 ordered stricken.  As I indicated before, only the witnesses'

18 answers are evidence and you are not to consider a question as

19 evidence.  Statements by counsel or the defendant are not

20 evidence.

21      You should consider the evidence in light of your own

22 common sense and experience, and you may draw reasonable

23 inferences from the evidence.

24      Anything you may have seen or heard outside this

25 courtroom about this case is not evidence and must be entirely

1 disregarded.

2     The government has presented exhibits in the form of

3 charts and summaries which were admitted as evidence.  These

4 charts and summaries were admitted in place of the underlying

5 documents that they represent in order to save time and avoid

6 unnecessary inconvenience.  You should consider these charts

7 and summaries as you would any other evidence.

8     The government has also shown to you certain summary

9 charts which were marked as evidence which were just shown to

10 you in order to make other evidence more meaningful and to aid

11 you in considering the evidence.  They are no better than the

12 testimony or the documents upon which they are based and are

13 not themselves independent evidence.  Therefore, you are to

14 give no greater consideration to these charts or summaries than

15 you would give to the evidence upon which they are based.

16     It is for you to decide whether such exhibits correctly

17 present the information contained in the testimony and in the

18 exhibits on which they are based.  You are entitled to consider

19 the charts and summaries if you find they are of use to you in

20 analyzing the evidence and understanding the evidence.

21     Let me emphasize again that a lawyer's question as well

22 as questions posed by the defendant -- and let me, in case I

23 sometimes forget to do it, whenever in this case I am referring

24 to lawyers, I am including Mr. Ojo.

25     So I will say again:  Let me emphasize that a lawyer's

1   questions as well as questions posed by the defendant while

2   acting as his own lawyer are not evidence.  At times, a lawyer,

3   or the defendant while acting as his own lawyer, on

4   cross-examination may have incorporated into a question a

5   statement which assumed certain facts to be true and asked the

6   witness if the statement was true.  If the witness denies the

7   truth of the statement and there is no evidence in the record

8   proving that the assumed fact is true, then you may not

9   consider the fact to be true simply because it was contained in

10  the lawyer's question or the defendant's question.  In short,

11  questions not evidence; only the answers are.

12      The government has been permitted to display typed

13  documents that it prepared containing the government's

14  interpretation of what appears on certain recordings which have

15  been received as evidence.  Those were shown to you as an aid

16  or guide to assist you in listening to the recordings.  They

17  are not, in and of themselves, evidence.  Therefore, when the

18  recordings were played, I advised you to listen very carefully

19  to the recordings themselves.  You alone should make your own

20  interpretation of what appears on the recordings based on what

21  you heard.  If you think you heard something differently than

22  what appeared on the transcript, what you heard is what's

23  controlling.

24      Let me say again that you, ladies and gentlemen, the

25  jury, are the sole judges of the facts.

1          The government has offered evidence in the form of tape

2    recordings of the defendant.  These recordings were made

3    without the knowledge of the defendant but with the consent and

4    agreement of one of the other parties to the conversations.

5          The use of this procedure to gather evidence is perfectly

6    lawful, and the government is entitled to use those recordings

7    in this case.

8          There has been evidence introduced at trial that the

9    government used an informant in this case.  I instruct you that

10   there is nothing improper in the government's use of

11   informants, and, indeed, certain criminal conduct may not be

12   detected without the use of informants.  You, therefore, should

13   not concern yourselves with how you personally feel about the

14   use of informants because that is really not the issue.  Put

15   another way, your concern is to decide whether the government

16   has proved the guilt of the defendant beyond a reasonable doubt

17   regardless of whether the evidence was obtained by the use of

18   an informer.

19         On the other hand, when an informant testifies, the

20   informant's testimony must be examined with greater scrutiny

21   than the testimony of an ordinary witness.  You should consider

22   whether the informant received any benefits or promises from

23   the government that would motivate him or her to testify

24   falsely against the defendant.  For example, he or she may

25   believe that they will only continue to receive those benefits

1    if they produce evidence of criminal conduct.

2          If you decide to accept an informant's testimony after

3    considering it in the light of all the evidence in this case,

4    then you may give it whatever weight, if any, you decide it

5    deserves.

6          During the trial, you have heard testimony of witnesses

7    and you may hear argument by the defendant regarding whether

8    the government used specific investigative techniques.  You may

9    consider these facts in deciding whether the government has met

10   its burden of proof because as I told you, you should look to

11   all of the evidence or lack of evidence in deciding whether the

12   defendant is guilty.  However, you are also instructed that

13   there is no legal requirement that the government use any

14   specific investigative techniques to prove its case.  For

15   example, there is no requirement to attempt to analyze evidence

16   for fingerprints or DNA.  Law enforcement techniques are not

17   your concern.

18         Your concern, as I have said, is to determine whether or

19   not, on the evidence or lack of evidence, the defendant's guilt

20   has been proved beyond a reasonable doubt.

21         There are persons whose names you have heard during the

22   course of the trial but who did not appear here to testify, and

23   the defendant may refer to their absence from the trial.  I

24   instruct you that each party had an equal opportunity or lack

25   of opportunity to call any of these witnesses.  Therefore, you

1   should not draw any inferences or reach any conclusions as to

2   what they would have testified to had they been called.  Their

3   absence should not affect your judgment in any way.

4          You should, however, remember my instruction that the law

5   does not impose on a defendant in a criminal case the burden or

6   duty of calling any witnesses or producing any evidence.

7          You have heard testimony in this case regarding evidence

8   seized by the government pursuant to search warrants.  You are

9   hereby instructed that it is the responsibility of the Court

10  alone to determine the validity and legality of the search

11  warrants.  It is up to you to decide what significance, if any,

12  the evidence seized may have in this case.

13         There has also been evidence introduced at trial that

14  witnesses were subpoenaed to come to court to testify.  A

15  subpoena is nothing more than a formal written order of the

16  Court requiring a person to appear.  I instruct you that the

17  issuance of a subpoena is a routine process in the court system

18  and is perfectly proper.  Each party had equal opportunity to

19  obtain subpoenas for witnesses to appear at trial.

20         In their arguments, the attorneys or the defendant may

21  ask you to infer on the basis of your reason, experience, and

22  common sense, from one or more established facts, the existence

23  of some other fact.

24         An inference is not a suspicion or a guess.  It is a

25  reasoned, logical decision to conclude that a disputed fact

1   exists on the basis of another fact that you know exists.

2        There are times when different inferences may be drawn

3   from facts, whether proved by direct or circumstantial

4   evidence.  The government asks you to draw one set of

5   inferences, while the defendant asks you to draw another.  It

6   is for you and you alone to decide what inferences you will

7   draw.

8        The process of drawing inferences from facts in evidence

9   is not a matter of guesswork or speculation.  An inference is a

10   deduction or conclusion which you, the jury, are permitted to

11   draw, but not required to draw, from the facts that have been

12   established by either direct or circumstantial evidence.  In

13   drawing inferences, you should exercise your common sense.

14        So, while you are considering the evidence presented to

15   you, you are permitted to draw from the facts that you find to

16   be proven such reasonable inferences as would be justified in

17   light of your experience.

18        Here again, let me remind you that, whether based upon

19   direct or circumstantial evidence, or upon the logical,

20   reasonable inferences drawn from such evidence, you must be

21   satisfied of the guilt of the defendant beyond a reasonable

22   doubt before you convict the defendant.

23        You have had an opportunity to observe all of the

24   witnesses.  It is now your job to decide how believable each

25   witness was in his or her testimony.  You are the sole judges

1   of the credibility of each witness and of the importance of his

2   or her testimony.

3        It must be clear to you by now that the government and

4   the defendant are asking you to draw very different conclusions

5   about various factual items in the case.  You will now have to

6   decide where the truth lies, and an important part of that

7   decision will involve making judgments about the testimony of

8   the witnesses you have listened to and observed.  In making

9   those judgments, you should carefully scrutinize all of the

10  testimony of each witness, the circumstance under which each

11  witness testified, and any other matter in evidence which may

12  help you to decide the truth and the importance of each

13  witness's testimony.

14       Your decision whether or not to believe a witness may

15  depend on how that witness impressed you.  Was the witness

16  candid, frank, and forthright?  Or did the witness seem as if

17  he or she was hiding something, being evasive, or suspect in

18  some way?  How did the way the witness testified on direct

19  examination compare with the way the witness testified on

20  cross-examination?  Was the witness consistent in his or her

21  testimony or did he or she contradict himself or herself?  Did

22  the witness appear to know what he or she was talking about?

23  Did the witness strike you as someone who was trying to report

24  his or her knowledge accurately?  These are examples of the

25  kinds of common sense questions you should ask yourselves in

1    deciding whether a witness is or is not truthful.

2         How much you choose to believe a witness may also be

3    influenced by the witness's bias.  Does the witness have a

4    relationship with the government or the defendant which may

5    affect how he or she testified?  Does the witness have some

6    incentive, loyalty, or motive that might cause him or her to

7    shade the truth?  Does the witness have some bias, prejudice,

8    or hostility that may have caused the witness, consciously or

9    not, to give you something other than a completely accurate

10   account of the facts he or she testified to?

11        You should also consider whether the witness had an

12   opportunity to observe the facts he or she testified about.

13   Ask yourself whether the witness's recollection of the facts

14   stands up in light of the other evidence in the case.

15        In other words, what you must try to do in deciding

16   credibility is to size a person up in light of his or her

17   demeanor, the explanations given, and in light of all the other

18   evidence in the case, just as you would in any important matter

19   where you are trying to decide if a person is truthful,

20   straightforward, and accurate in his or her recollection.  In

21   deciding the question of credibility, remember that you should

22   use your common sense, your good judgment, and your experience.

23        You may have heard evidence that a witness made a

24   statement on an earlier occasion which counsel or the defendant

25   argues is inconsistent with the witness's trial testimony.

1   Evidence of the prior inconsistent statement was placed before

2   you for the limited purpose of helping you decide whether to

3   believe the trial testimony of the witness.  If you find that

4   the witness made an earlier statement that contradicts with his

5   or her trial testimony, you may consider that fact in deciding

6   how much of his or her trial testimony, if any, to believe.

7        In making this determination, you may consider whether

8   the witness purposely made a false statement or whether it was

9   an innocent mistake; whether the inconsistency concerned an

10  important fact, or whether it had to do with a small detail;

11  whether the witness had an explanation for the inconsistency;

12  and whether that explanation appealed to your common sense.

13       It is exclusively your duty, based upon all evidence and

14  your own good judgment, to determine whether the prior

15  statement was inconsistent, and if so, how much if any weight

16  to be given to the inconsistent statement in determining

17  whether to believe all or part of the witness's testimony.

18       In evaluating the credibility of the witnesses, you

19  should take into account any evidence that the witness who

20  testified may benefit in some way from the outcome of this

21  case.  Such an interest in the outcome creates a motive to

22  testify falsely and may sway the witness to testify in a way

23  that advances his or her own interests.  Therefore, if you find

24  that any witness whose testimony you are considering may have

25  an interest in the outcome of this trial, then you should bear

1  that factor in mind when evaluating the credibility of his or

2  her testimony and accept it with great care.

3       This is not to suggest that every witness who has an

4  interest in the outcome of a case will testify falsely.  It is

5  for you to decide to what extent, if at all, the witness's

6  interest has affected or colored his or her testimony.

7       You have heard witnesses who testified that they were

8  actually involved in carrying out certain crimes that are

9  charged in the second superseding indictment.  There has been a

10 great deal said about the so-called accomplice witnesses during

11 the case and likely in the summations of counsel for the

12 government and the defendant and whether or not you should

13 believe them.

14      The government argues, as it is permitted to do, that it

15 must take the witnesses as it finds them.  It argues that only

16 people who themselves take part in criminal activity have the

17 knowledge required to show criminal behavior by others.

18      For those very reasons, the law allows the use of

19 accomplice testimony.  Indeed, it is the law in federal courts

20 that the testimony of accomplices may be enough in itself for a

21 conviction if the jury finds that the testimony establishes

22 guilt beyond a reasonable doubt.

23      However, it is also the case that accomplice testimony is

24 of such nature that it must be scrutinized with great care and

25 viewed with particular caution when you decide how much of that

1   testimony to believe.

2       I have given you some general considerations on

3   credibility and I am not going to repeat them all now.  Nor

4   will I repeat all the arguments or predict all the arguments

5   that are going to be made on both sides.  However, let me say a

6   few things that you may want to consider during your

7   deliberation on the subject of accomplices.

8       You should ask yourselves whether these so-called

9   accomplices would benefit more by lying or by telling the

10  truth.  Was their testimony made up in any way because they

11  believed or hoped that they would somehow receive favorable

12  treatment by testifying falsely?  Or did they believe that

13  their interest would be best served by testifying truthfully?

14  If you believe that the witness was motivated by hopes of

15  personal gain, was the motivation one that would cause him to

16  lie, or was it one that would cause him to tell the truth?  Did

17  this motivation color his or her testimony?

18      In sum, you should look at all of the evidence in

19  deciding what credence and what weight, if any, you will want

20  to give to the accomplice witnesses.

21      In this case, I have permitted certain witnesses to

22  express their opinions about matters that are in issue.  A

23  witness may be permitted to testify to an opinion on those

24  matters about which he or she has special knowledge, skill,

25  experience, and training.  Such testimony is presented to you

on the theory that someone who is experienced and knowledgeable in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing this opinion testimony, you may consider the witness's qualifications, his or her opinions, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony. You may give the opinion testimony whatever weight, if any, you find it deserves in light of all the evidence in this case. You should not, however, accept opinion testimony merely because I allowed the witness to testify concerning his or her opinion. Nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

You have heard the testimony of law enforcement officials. The fact that a witness may be employed by the federal or state government as a law enforcement official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

At the same time, it is quite legitimate for the defendant to try to attack the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the

1  case.

2       It is your decision, after reviewing all the evidence,

3  whether to accept the testimony of the law enforcement witness

4  and to give that testimony whatever weight, if any, you find it

5  deserves.

6       The defendant chose not to testify in this case.  Under

7  our Constitution, the defendant has no obligation to testify or

8  to present any other evidence because it's the government's

9  burden to prove a defendant guilty beyond a reasonable doubt.

10  The burden remains with the government throughout the entire

11  trial and never shifts to the defendant.  The defendant is

12  never required to prove that he is innocent.

13       Therefore, you may not attach any significance to the

14  fact that the defendant did not testify.  No adverse inference

15  against the defendant may be drawn by you because he did not

16  take the witness stand.  You may not consider this against the

17  defendant in any way in your deliberations in the jury room.

18       The government has offered evidence tending to show that

19  on a different occasion, the defendant engaged in conduct

20  similar to the charges that are in the second superseding

21  indictment.

22       In that connection, let me remind you that the defendant

23  is not on trial for committing any such acts not alleged in the

24  second superseding indictment.  Accordingly, you may not

25  consider that evidence of the similar acts as substitute for

1  proof the defendant committed the crimes charged.  Nor may you

2  consider this evidence as proof that the defendant has a bad

3  personality or bad character.  The evidence of the other

4  similar acts was admitted for a much more limited purpose and

5  you may consider it only for that limited purpose.

6       If you determine that the defendant committed the acts

7  charged in this second superseding indictment -- let me try

8  that again.

9       If you determine that the defendant committed the acts

10 charged in the second superseding indictment and the similar

11 acts as well, then you may, but need not, draw an inference

12 that in doing the acts charged in the second superseding

13 indictment, the defendant acted knowingly and intentionally and

14 not because of some mistake, accident, or other innocent

15 reason.

16      Evidence of similar acts may not be considered by you for

17 any other purpose.  Specifically, you may not use this evidence

18 to conclude that because the defendant committed the other act,

19 he must also have committed the acts charged in the second

20 superseding indictment.

21      With all of these preliminary instructions in mind, let

22 us turn to the charges against the defendant as they are

23 contained in the second superseding indictment.  I remind you

24 that an indictment itself is not evidence.  It merely describes

25 the charges made against the defendant.  It's an accusation.

1  It may not be considered by you as evidence of the guilt of the

2  defendant.

3       In reaching your determination of whether the defendant

4  -- excuse me, whether the government has proved that the

5  defendant is guilty beyond a reasonable doubt, you may consider

6  only the evidence introduced or the lack of such evidence.

7       The defendant is not charged with committing any crime

8  other than the offenses contained in the second superseding

9  indictment.  You have heard evidence of other acts allegedly

10  considered -- committed by the defendant.  When that evidence

11  was introduced, I instructed you that such evidence is to be

12  considered by you solely for a limited purpose.  I want to

13  emphasize you are not to consider that evidence for any other

14  purpose and only return a verdict as to the charges in the

15  second superseding indictment.

16       While we are on the subject of the second superseding

17  indictment, I should draw your attention to the fact that the

18  second superseding indictment charges that the offenses

19  occurred on or about a specific date.  The proof need not

20  establish with any certainty the exact date of the specific

21  acts or offenses.  It is sufficient if the evidence in this

22  case establishes that the offenses were committed on dates

23  reasonably near the date alleged in the second superseding

24  indictment.  The law only requires a substantial similarity

25  between the date alleged in the second superseding indictment

1    and the date established by testimony or exhibits.

2         You may not draw any inference, favorable or unfavorable,

3    towards the government or the defendant on trial from the fact

4    that certain persons were not named as defendants or

5    coconspirators in the second superseding indictment.  The

6    circumstances that these persons are not in this trial must

7    play no part in your deliberations.

8         Whether a person should be named as a coconspirator or

9    indicted as a defendant is a matter within the sole discretion

10   of the United States Attorney and the grand jury.  Therefore,

11   you may not consider it in any way in reaching your verdict as

12   to the defendant who is on trial.

13        We will next consider the crimes with which the defendant

14   is charged.

15        Count One charges the defendant with conspiracy to

16   distribute and possess with intent to distribute controlled

17   substances.  Counts Two, Three, Four, and Five each charge the

18   defendant with distribution of and possession with intent to

19   distribute controlled substances.  Count Six charges the

20   defendant with possession with intent to distribute a

21   controlled substance.

22        The defendant denies that he is guilty of these charges.

23        It has been said that a crime consists of two principal

24   parts: a criminal intent and a criminal act.

25        Let me talk for a moment about criminal intent.

1    Generally, intent to do something means someone knows that he

2    or she is doing -- someone knows what he or she is doing and

3    does it on purpose or willfully.  For the crimes charged in

4    this case, the government must show beyond a reasonable doubt

5    that the defendant knowingly did something or knew something.

6    I will now provide for you a definition of the term "knowingly"

7    and "intentionally."

8         Knowledge involves the state of a person's mind.  It has

9    often been said to juries that the state of one's mind is a

10   fact as much as the state of his digestion.  Accordingly, this

11   is a fact you are called upon to decide.

12        Medical science has not yet devised an instrument which

13   can record what was in one's mind in the distant past.  Rarely

14   is direct proof available to establish the state of one's mind.

15   This may be inferred from what the defendant says or does, his

16   words, his actions, and his conduct as of the time of the

17   occurrence of certain events.

18        The intent with which an act is done is often more

19   clearly and conclusively shown by the act itself, or by a

20   series of acts, than by words or explanations of the act

21   uttered long after its occurrence.  Accordingly, intent and

22   knowledge are usually established by surrounding facts and

23   circumstances as of the time the acts in question occurred, or

24   the events took place, and the reasonable inferences to be

25   drawn from them.

1       A person acts knowingly if he acts intentionally and
2   voluntarily, and not because of ignorance, mistake, accident,
3   or carelessness.  Whether the defendant acted knowingly may be
4   proven by the defendant's conduct and by all of the facts and
5   circumstances surrounding the case.
6       Willful intent or guilty knowledge may be inferred from
7   the secretive or irregular manner in which a transaction is
8   carried out.
9       You have been instructed that in order to sustain its
10  burden of proof, the government must prove that the defendant
11  acted intentionally.  Before you can find that the defendant
12  acted intentionally, you must be satisfied beyond a reasonable
13  doubt that the defendant acted deliberately and purposefully.
14  That is, defendant's acts must have been the product of
15  defendant's conscious objective rather than the product of a
16  mistake or an accident.
17      The second superseding indictment contains a total of six
18  counts.  Each count charges the defendant with a distinct
19  crime.  You must consider each count of the second superseding
20  indictment separately and return a separate verdict of guilty
21  or not guilty for each.  Whether you find the defendant guilty
22  or not guilty as to one offense should not affect your verdict
23  as to the other offenses charged.
24      Count One of the second superseding indictment charges
25  the defendant with a conspiracy to violate the laws of the

1    United States governing controlled substances.

2        Count One states as follows:  That between at least in or

3    about May 2016 and in or about July 2018, in the District of

4    Maryland and elsewhere, the defendant, Adebowale Ojo, also

5    known as "Debo," did knowingly combine, conspire, confederate,

6    and agree with others known and unknown to the grand jury to

7    distribute and possess with intent to distribute 28 grams or

8    more of a mixture or substance containing a detectable amount

9    of cocaine base, a Schedule II controlled substance; a mixture

10   and substance containing a detectable amount of cocaine, a

11   Schedule II controlled substance; and a mixture and substance

12   containing a detectable amount of heroin, a controlled -- a

13   Schedule I controlled substance, in violation of 21, U.S.C.,

14   Section 841.

15       I will first explain the conspiracy statute.  Then I will

16   explain the law of conspiracy which applies to Count One of the

17   second superseding indictment.

18       In this case, the defendant is accused of having been a

19   member of a conspiracy to violate certain federal laws.  A

20   conspiracy is a kind of criminal partnership, a combination or

21   agreement of two or more persons to join together to accomplish

22   some unlawful purpose.  The crime of conspiracy to violate a

23   federal law is an independent offense.  It is separate and

24   distinct from the actual violation of any specific federal

25   laws, which the law refers to as substantive crimes.  Indeed,

1  you may find the defendant guilty of the crime of conspiracy to

2  commit an offense against the United States even though the

3  substantive crime which was the object of the conspiracy was

4  not actually committed.  Congress has deemed it appropriate to

5  make conspiracy, standing alone, a separate crime even if the

6  conspiracy is not successful.  This is because collective

7  criminal activity poses a greater threat to the public safety

8  and welfare than individual conduct, and increases the

9  likelihood of success of a particular criminal venture.

10       In order to satisfy its burden of proof as to the

11  conspiracy charged in Count One, the government must establish

12  each of the following essential elements beyond a reasonable

13  doubt:  First, that at least two or more persons entered the

14  unlawful agreement charged in Count One of the second

15  superseding indictment, that is, an agreement to distribute or

16  possess with intent to distribute a controlled substance;

17  second, that the defendant knowingly and willfully became a

18  member of the conspiracy.

19       I will now review these elements in greater detail.

20       The first element which the government must prove beyond

21  a reasonable doubt to establish the offense of conspiracy is

22  that two or more persons entered the unlawful agreement

23  charged, which is to distribute and possess with intent to

24  distribute a controlled substance.

25       In order for the government to satisfy this element, you

1  need not find that the alleged members of the conspiracy met

2  together and entered into any express or formal agreement.

3  Similarly, you need not find that the alleged conspirators

4  stated, in words or writing, what the scheme was, its object or

5  purpose, or every precise detail of the scheme or the means by

6  which its object or purpose was to be accomplished.  What the

7  government must prove is that there was a mutual understanding,

8  either spoken or unspoken, between two or more people to

9  cooperate with each other to accomplish an unlawful act.

10      It is not sufficient that the unlawful agreement was only

11  between the defendant and a government agent.  Some other

12  person who was not a government agent, or who was not a

13  government agent at the time of the unlawful agreement, must

14  have entered into the unlawful agreement with the defendant in

15  order for a conspiracy to exist.

16      You may, of course, find that the existence of an

17  agreement to disobey or disregard the law has been established

18  by direct proof.  However, since conspiracy is, by its very

19  nature, characterized by secrecy, you may also infer its

20  existence from the circumstances of this case and the conduct

21  of the parties involved.

22      In a very real sense, then, in the context of conspiracy

23  cases, actions often speak louder than words.  In this regard,

24  you may, in determining whether an agreement existed here,

25  consider the actions and statements of all those you find to be

1  participants as proof that a common design existed on the part

2  of the persons charged to act together for the accomplishment

3  of an unlawful purpose.

4      The second element which the government must prove beyond

5  a reasonable doubt to establish the offense of conspiracy is

6  that the defendant knowingly, willfully, and voluntarily became

7  a member of the conspiracy.

8      If you are satisfied that the conspiracy charged existed,

9  you must next ask yourselves who the members of the conspiracy

10  were.  In deciding if the defendant was, in fact, a member of

11  the conspiracy, you should consider whether the defendant

12  knowingly and willfully joined the conspiracy.  Did he

13  participate in it with knowledge of its unlawful purpose and

14  with the specific intention of furthering its business or

15  objective as an associate or worker?

16      In that regard, it has been said that in order for the

17  defendant to be deemed a participant in a conspiracy, he must

18  have had a stake in the venture or its outcome.  You are

19  instructed that while proof of a financial interest in the

20  outcome of a scheme is not essential, if you find the defendant

21  had such an interest, that is a factor with which you may

22  properly consider in determining whether or not the defendant

23  was a member of the conspiracy charged in the second

24  superseding indictment.

25      As I mentioned a moment ago, before the defendant can be

1    found to have been a conspirator, you must find that he

2    knowingly joined in the unlawful agreement or plan.

3         The key question, therefore, is whether the defendant

4    joined the conspiracy with an awareness of at least some of the

5    basic aims and purposes of the unlawful agreement.  However,

6    you may also find that he acted knowingly from circumstantial

7    evidence or from proof that he deliberately closed his eyes to

8    what otherwise would have been obvious to him.

9         It is important for you to note that the defendant's

10   participation in the conspiracy must be established by

11   independent evidence of his own acts or statements and the

12   reasonable inferences which may be drawn from them.

13        The defendant's knowledge is a matter of inference from

14   the facts proved.  In that connection, I instruct you that to

15   become a member of the conspiracy, the defendant need not have

16   known the identities of each and every member, nor need he have

17   been apprised of all of their activities.  Moreover, the

18   defendant need not have been fully informed as to all of the

19   details or the scope of the conspiracy in order to justify an

20   inference of knowledge on his part.

21        Furthermore, the defendant need not have joined in all of

22   the conspiracy's unlawful objectives.  The extent of the

23   defendant's participation has no bearing on the issue of the

24   defendant's guilt.  The conspirator's liability is not measured

25   by the extent or duration of his participation.  Indeed, each

1   member may perform separate and distinct acts and may perform

2   them at different times.  Some conspirators play major roles,

3   while others play minor parts in the scheme.  An equal role is

4   not what the law requires.  In fact, even a single act may be

5   sufficient to draw the defendant within the ambit of the

6   conspiracy and only a slight knowing and willful connection

7   need be shown linking the defendant to the conspiracy to

8   support a finding that the defendant was a member of the

9   conspiracy, though the government must prove the connection,

10  however slight, beyond a reasonable doubt.

11        Thus, the defendant may be convicted of conspiracy

12  without full knowledge of all of the conspiracy's details if he

13  joined the conspiracy with an understanding of the unlawful

14  nature thereof and willfully joined in the plan on at least one

15  occasion, even though he may not have participated before,

16  might not participate again, and played only a minor role.

17        Participation in a conspiracy may assume a myriad of

18  other forms, assuming the other elements of the conspiracy are

19  proven.

20        I want to caution you, however, that the defendant's mere

21  presence at the scene of an alleged crime does not, by itself,

22  make him a member of the conspiracy.  Similarly, association

23  with one or more members of the conspiracy does not

24  automatically make the defendant a member.  A person may know

25  or be friendly with a criminal without being a criminal

1   himself.  Mere similarity of conduct or the fact that they may

2   have assembled together and discussed common aims and interests

3   does not necessarily establish membership in the conspiracy.

4        I also want to caution you that mere knowledge or

5   acquiescence, without participation, in the unlawful plan is

6   not sufficient.  Moreover, the fact that the acts of the

7   defendant, without knowledge, merely happen to further the

8   purposes or objectives of the conspiracy, does not make the

9   defendant a member.  More is required under the law.  What is

10  necessary is that the defendant must have participated with

11  knowledge of at least some of the purposes or objectives of the

12  conspiracy and with the intention of aiding in the

13  accomplishment of those unlawful ends.

14       In sum, before you find the defendant guilty of

15  conspiracy, the government must have proved beyond a reasonable

16  doubt that the defendant, with an understanding of the unlawful

17  character of the conspiracy, must have intentionally engaged,

18  advised, or assisted in it for the purpose of furthering the

19  illegal undertaking.  He thereby becomes a knowing and willing

20  participant in the unlawful agreement, that is to say, a

21  conspirator.

22       Counts Two, Three, Four and Five of the second

23  superseding indictment each charge the defendant with

24  distribution of and possession with intent to distribute a

25  controlled substance.

1       Count Two states as follows:  On or about January 23rd,
2   2018, in the District of Maryland and elsewhere, the defendant,
3   Adebowale Ojo, a/k/a "Debo," knowingly distributed and
4   possessed with intent to distribute a mixture and substance
5   containing a detectable amount of cocaine, a Schedule II
6   controlled substance; and a mixture and substance containing a
7   detectable amount of heroin, a Schedule I controlled substance.

8       Count Three states as follows:  That on or about February
9   8th, 2018, in the District of Maryland and elsewhere, the
10  defendant, Adebowale Ojo, a/k/a "Debo," knowingly distributed
11  and possessed with intent to distribute a mixture and substance
12  containing a detectable amount of cocaine base, a Schedule II
13  controlled substance; and a mixture and substance containing a
14  detectable amount of heroin, a Schedule I controlled substance,
15  N-phenyl propenamide, also known as fentanyl, a Schedule II
16  controlled substance; and 4-anilino-N-phenethyl-4-piperidine,
17  also known as ANPP, a Schedule II controlled substance.

18      Count Four states as follows:  On or about February 15,
19  2018, in the District of Maryland and elsewhere, the defendant,
20  Adebowale Ojo, a/k/a "Debo," knowingly distributed and
21  possessed with intent to distribute a mixture and substance
22  containing a detectable amount of cocaine, a Schedule II
23  controlled substance; and a mixture and substance containing a
24  detectable amount of heroin, a Schedule I controlled substance,
25  and N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] -- clearly, I

1  am not a chemist -- propenamide, also known as fentanyl, a

2  Schedule II controlled substance.

3      Count Five states as follows:  That on or about March

4  7th, 2018, in the District of Maryland and elsewhere, the

5  defendant, Adebowale, also known as "Debo" -- excuse me,

6  Adebowale Ojo, also known as "Debo," knowingly distributed and

7  possessed with intent to distribute a mixture and substance

8  containing a detectable amount of cocaine base, a Schedule II

9  controlled substance; and a mixture and substance containing a

10 detectable amount of heroin, a Schedule I controlled substance,

11 and N-phenyl-N-[1(2-phenylethyl)4-piperidinyl] propenamide,

12 also known as fentanyl, a Schedule II controlled substance.

13      In order to prove Counts Two through Five against the

14 defendant, the government must establish beyond a reasonable

15 doubt each of the following three elements of the crime:

16 First, that the defendant possessed a controlled substance;

17 second, that the defendant knew that he possessed a controlled

18 substance; and third, that the defendant knowingly distributed

19 the controlled substance or intended to distribute the

20 controlled substance.

21      The first element you must determine is whether the

22 defendant possessed the controlled substance.  That is, the

23 government must prove that the material that the defendant is

24 charged with possessing is, in fact, the controlled substance

25 that's alleged in the indictment.

1          The government may prove this through either direct or

2     circumstantial evidence.  An example of direct evidence would

3     be the testimony of a chemist who has done a chemical analysis

4     of the material.  Circumstantial evidence would be evidence

5     from which you can infer that the material was a particular

6     drug, such as testimony concerning the names used by buyers or

7     sellers to refer to the material or testimony about the

8     material's appearance.  Whether the government relies on direct

9     or circumstantial evidence to prove the material was a

10    controlled substance, it must prove so beyond a reasonable

11    doubt.

12         As I have instructed you, to convict someone of

13    possession with intent to distribute drugs, you must find that

14    the defendant possessed the drugs.  The legal concept of

15    possession differs in some respects from the everyday usage of

16    the term, so I will explain it in some detail.

17         Actual possession is what most of us think of as

18    possession; that is having physical custody or control of an

19    object.  For example, if you find that the defendant had the

20    drugs on his person, you may find that he had possession of the

21    drugs.  However, a person need not have actual possession --

22    excuse me.  However, a person need not have actual physical

23    custody of an object in order to be in legal possession of it.

24    If an individual has the ability and intent to exercise

25    substantial control over an object that he does not have in his

1    physical custody, then he may be in possession of that item.

2    An example of this from everyday experience would be a person's

3    possession of items he keeps in a safe deposit box of his bank.

4    Although the person does not have physical custody of those

5    items, he knows of the contents and exercises substantial

6    control over them, and so has what is known as constructive

7    possession of them.

8          Possession of the drugs cannot be found solely on the

9    ground that the defendant was near or close to the drugs.  Nor

10   could it be found simply because the defendant was present at a

11   scene where drugs were involved, or solely because the

12   defendant was associated with a person who does control the

13   drugs or the property where they are found.  These factors,

14   however, may be considered by you in connection with all other

15   evidence in making your decision whether the defendant

16   possessed the drugs.

17         The law recognizes that possession may be sole or joint.

18   If one person alone possesses something, that is sole

19   possession.  However, it is possible that more than one person

20   may have the power and intention to exercise control over the

21   drugs.  This is called joint possession.  If you find that the

22   defendant had power and intention to exercise control over the

23   drugs, then he possessed the drugs even if he possessed the

24   drugs jointly with another person.  For purposes of determining

25   a defendant's guilt, joint possession is no different from sole

1    possession.

2          However, a defendant does not have joint possession of

3    drugs simply because he associates with the person who does

4    have possession and control over the drugs.

5          If you find that the defendant possessed drugs, you must

6    then determine whether the defendant knew that he possessed

7    illegal drugs.  The government must prove beyond a reasonable

8    doubt that the defendant knew that he possessed illegal drugs

9    and that his possession was not due to carelessness,

10   negligence, or mistake.  If you find that the defendant did not

11   know that what he possessed was drugs, then you must find the

12   defendant not guilty.

13         Although the government must prove that the defendant

14   knew that he possessed illegal drugs, the government does not

15   have to prove that the defendant knew the exact nature of the

16   drugs in his possession.  It is enough that the government

17   proves that the defendant knew that he possessed some kind of

18   illegal drug.

19         Your decision whether a defendant knew the materials he

20   possessed were illegal drugs involves a decision about the

21   defendant's state of mind.  It is obviously impossible to prove

22   directly the operation of a defendant's mind.  But a wise and

23   intelligent consideration of all the facts and circumstances

24   shown by the evidence and the exhibits in the case may enable

25   you to infer what the defendant's state of mind was.

1          In our everyday affairs, we are continuously called upon

2     to decide from the actions of others what their state of mind

3     is.  Experience has taught us that, frequently, actions speak

4     louder than words -- excuse me, actions speak louder and more

5     clearly than spoken or written words.  Therefore, you may well

6     rely in part on circumstantial evidence in determining the

7     defendant's state of mind.

8          For example, if the defendant was the sole occupant of a

9     residence or a vehicle, it's reasonable to conclude that the

10    defendant knew about items in the residence or vehicle.  A

11    defendant's behavior may also indicate knowledge.  Nervousness

12    in the presence of the drugs or flight from the site at which

13    authorities have identified drugs may indicate that the

14    defendant knew that the materials in question were controlled

15    substances.  Also, the possession of a large quantity of drugs

16    may indicate that the defendant knew what he had in his

17    possession.  These examples are neither exhaustive nor

18    conclusive.  It is up to you, based on all the evidence, to

19    determine whether the defendant knew that he possessed

20    controlled substances.

21         The third element the government must prove beyond a

22    reasonable doubt for Count Two through Five is that the

23    defendant either distributed the controlled substance or

24    intended to distribute the controlled substance.  In order to

25    prove the defendant is guilty, the government must prove one of

1   these circumstances beyond a reasonable doubt.  It need not

2   prove both.

3       The word "distribute" means to deliver a drug.  "Deliver"

4   is defined as the actual, constructive, or attempted transfer

5   of a drug.  Simply stated, the words "distribute" and "deliver"

6   mean to pass on, or to hand over to another, or to cause to be

7   passed on or handed to another, or to try to pass on or hand

8   over to another, drugs.  For example, if A tells or orders B to

9   hand over the drugs to C, then A has caused the drugs to be

10  handed over, and therefore has distributed them.

11      Distribution does not require a sale.  Activities in

12  furtherance of the ultimate sale, such as vouching for the

13  quality of the drugs, negotiating for or receiving the price,

14  and supplying or delivering the drugs may constitute

15  distribution.  In short, distribution requires a concrete

16  involvement in the transfer of the drugs.

17      To prove that the defendant intended to distribute the

18  controlled substance, the government must prove beyond a

19  reasonable doubt that the defendant had control over the drug

20  with the state of mind or purpose to transfer it to another

21  person.

22      Since you cannot read the defendant's mind, you may make

23  inferences from his behavior.  However, you may not convict the

24  defendant unless these inferences convince you beyond a

25  reasonable doubt that the defendant intended to distribute the

1 drugs.  The same considerations that apply to your

2 determination whether the defendant knew he possessed drugs

3 apply to your decision concerning the defendant's intention to

4 distribute them.

5      When I say that you must find that the defendant intended

6 to distribute the drugs, this does not mean that you must find

7 the defendant intended personally to distribute or deliver the

8 drugs.  It is sufficient if you find that the defendant

9 intended to cause or assist in the distribution of the drugs.

10      Basically, what you are determining is whether the drugs

11 that were in the defendant's possession were for his personal

12 use or for the purpose of distribution.  Often it is possible

13 to make this determination from the quantity of drugs found in

14 the defendant's possession.

15      The possession of a large quantity of drugs does not

16 necessarily mean that the defendant intended to distribute

17 them.  On the other hand, the defendant may have intended to

18 distribute drugs even if he did not possess large quantities of

19 them.  Other physical evidence, such as paraphernalia for

20 packaging or processing of drugs, may show an intent.

21      I am looking at the clock.  I am going to stop at about

22 1:15, which might leave me just a little bit short, but I don't

23 want to go too far past our lunch hour.

24      There might also be evidence of a plan to distribute.

25 You should make your decision whether the defendant intended to

1    distribute the drugs in his possession from all the evidence

2    presented.

3         Count Six of the second superseding indictment charges

4    the defendant with possession with intent to distribute MDMA, a

5    controlled substance.

6         Count Six states as follows:  On or about November 28,

7    2018, in the District of Maryland and elsewhere, the defendant,

8    Adebowale Ojo, a/k/a "Debo," did knowingly possess with intent

9    to distribute a mixture and substance containing a detectable

10   amount of 3,4-Methylenedioxymethamphetamine, commonly known as

11   MDMA, a Schedule I controlled substance.

12        In order to prove a charge of possession with intent to

13   distribute against the defendant, the government must establish

14   beyond a reasonable doubt each of the following three elements

15   of the crime:  First, that the defendant possessed a controlled

16   substance; second, that the defendant knew that he possessed a

17   controlled substance; and third, that the defendant intended to

18   distribute the controlled substance.

19        Each of the instructions related to possession,

20   knowledge, and intent to distribute that I have previously

21   discussed in relation to Counts Two through Five also apply to

22   Count Six, and so I am not going to repeat them here.

23        There is another method by which you may determine the

24   possible guilt of the defendant for the substantive charges in

25   the second superseding indictment even if you do not find that

1    the government has satisfied its burden of proof with respect

2    to each element of the substantive crime.

3        A conspirator is a person who knowingly or with willful

4    blindness intentionally agrees with one or more person to

5    accomplish an unlawful purpose.  A conspirator is responsible

6    for offenses committed by his or her fellow conspirators if he

7    was a member of the conspiracy when the offense was committed

8    and if the offense was committed in furtherance of and as a

9    foreseeable consequence of the conspiracy.

10       Accordingly, if, in light of my instructions, you find

11   beyond a reasonable doubt that the defendant was a member of

12   the conspiracy charged in Count One of the superseding

13   indictment and thus guilty of the conspiracy count, then you

14   may also, but you are not required to, find him guilty of the

15   substantive crimes charged against him in Counts Two, Three,

16   Four, and Five, provided you find beyond a reasonable doubt

17   each of the following elements:  First, that the crime charged

18   in the substantive count was actually committed; second, that

19   the person or persons you find actually committed the crime

20   were members of the conspiracy you found to have existed;

21   third, that the substantive crime was committed pursuant to the

22   common plan and understanding you found to exist among the

23   conspirators; fourth, that the defendant was a member of that

24   conspiracy at the time the substantive crime was committed; and

25   fifth, that the defendant could have reasonably foreseen that

1   the substantive crime might be committed by the coconspirators.

2          Likewise, if you find beyond a reasonable doubt that the

3   defendant was a member of the conspiracy charged in Count One

4   of the superseding indictment and thus guilty on the conspiracy

5   count, you may also, but you are not required to, find him

6   guilty of the substantive crime charged in Counts Two, Three,

7   Four, and Five provided you find beyond a reasonable doubt each

8   of the elements I just set forth.

9          If you find all five of these elements to exist beyond a

10  reasonable doubt, you may find the defendant guilty of the

11  substantive crime charged against him even though he did not

12  personally participate in the acts constituting the crime or

13  did not have actual knowledge of it.

14         The reason for this rule is simply that a coconspirator

15  who commits a substantive crime pursuant to a conspiracy is

16  deemed to be the agent of the other conspirators.  Therefore,

17  all of the coconspirators must bear criminal responsibility for

18  the commission of the substantive crime.

19         If, however, you are not satisfied as to the existence of

20  any of these five elements, then you may not find the defendant

21  guilty of the substantive crime, unless the government proves,

22  beyond a reasonable doubt, that the defendant personally

23  committed or aided and abetted the commission of the

24  substantive crimes charged.

25         Under the aiding and abetting statute, it is not

necessary for the government to show that the defendant himself physically committed the crime with which he is charged in order for the government to sustain its burden of proof.  A person who aids or abets another or willfully causes another to commit an offense is just as guilty of that offense as if he committed it himself.

Accordingly, you may find the defendant guilty of an offense charged in the second superseding indictment if you find beyond a reasonable doubt that the government has proven that another person committed the offense, and that the defendant aided or abetted that person in the commission of the offense, or willfully caused that person to commit the offense.

As you can see, the first requirement is that you find another person has actually committed the crime charged. Obviously, no one can be convicted of aiding or abetting or willfully causing the criminal acts of another if no crime was committed by the other person in the first place.  But if you do find that a crime was committed, then you must consider whether the defendant aided or abetted or willfully caused the commission of that crime.

I will discuss aiding and abetting first.  In order to aid or abet another to commit a crime, it is necessary that the defendant knowingly associate himself in some way with the crime and that he participate in the crime by doing some act to help make the crime succeed.

1    To establish that the defendant knowingly associated

2  himself with the crime, the government must establish that the

3  defendant intended to distribute a controlled substance, which

4  he knew was a controlled substance.

5    To establish that the defendant participated in the

6  commission of the crime, the government must prove that the

7  defendant engaged in some affirmative conduct or overt act for

8  the specific purpose of bringing about that crime.

9    Participation in a crime is willful if done voluntarily

10 and intentionally and with the specific intent to do something

11 which the law forbids or with the specific intent to fail to do

12 something the law requires to be done, that is to say, with a

13 bad purpose either to disobey or disregard the law.

14    The mere presence of a defendant where a crime is being

15 committed, even coupled with knowledge by the defendant that a

16 crime -- knowledge by the defendant that a crime is being

17 committed, or merely associating with others who are committing

18 a crime, is not sufficient to establish aiding and abetting.

19 One who has no knowledge that a crime is being committed or is

20 about to be committed but inadvertently does something that

21 aids in the commission of that crime is not an aider and

22 abettor.  An aider and abettor must know that the crime is

23 being committed and act in a way that is intended to bring

24 about the success of the criminal venture.

25    To determine whether a defendant aided or abetted the

1   commission of the crime with which he is charged, ask yourself

2   these questions:  Did he participate in the crime charged as

3   something he wished to bring about?  Did he knowingly associate

4   himself with the criminal venture?  Did he seek by his actions

5   to make the criminal venture succeed?

6        If he did, then the defendant is an aider and abettor and

7   therefore guilty of the offense.  If, on the other hand, your

8   answer to any of those questions is no, then the defendant is

9   not an aider and abetter and you must find him not guilty.

10        Next, as I mentioned, a person is guilty of an offense if

11   he or she willfully caused that offense.  What does "willfully

12   caused" mean?  It does not mean that the defendant himself need

13   have physically committed the crime or supervised or

14   participated in the actual criminal conduct charged in the

15   superseding indictment.

16        The meaning of the term "willfully caused" can be found

17   in the answers to the following questions:  Did the defendant

18   intend for the controlled substances to be distributed?  Did

19   the defendant intentionally cause another person to distribute

20   controlled substances?

21        If you are persuaded beyond a reasonable doubt that the

22   answer to both of these questions is yes, then the defendant is

23   guilty of the crime charged just as if he, himself, had

24   actually committed it.

25        I just have a few more instructions left, but we are well

1    passed our lunch break, so I am going to give you the lunch

2    break at this time.  I will ask that you be back at 2:15 ready

3    to go forward from there.  I have literally maybe five minutes

4    of instructions left, but we are just so far passed, I will do

5    those five minutes on the back end and then we will go right

6    into closing arguments.

7              So please remember -- you are getting close to being able

8    to discuss the case among yourselves, but as of right now, you

9    still can't do that, so remember my instruction, and I will see

10   you at 2:15.

11             (The jury panel exit the courtroom at 1:18 p.m.)

12             THE COURT:  All right.  I will see you at 2:15 unless

13   there is something else we need to discuss first.

14             MR. HALL:  No, Your Honor.  Can I stay here so I can

15   talk to him about what we were discussing?

16             THE COURT:  Please do.

17             MS. COLLINS:  Your Honor, apologies.  Just very

18   quickly.  I may have misheard, but there were a couple -- there

19   were two places where I think Your Honor may have just

20   misspoken and I want to make sure that they are cleared up.

21             THE COURT:  Sure.

22             MS. COLLINS:  In Instruction No. 47 when you were

23   describing Count Four, I think we heard -- I will give you a

24   minute to get there.

25             THE COURT:  I am there.

1          MS. COLLINS:  In Count Four, I think -- I believe

2   what I heard you say was a mixture and substance containing a

3   detectable amount of cocaine, and that should be cocaine base.

4          THE COURT:  Where was that?

5          MS. COLLINS:  Sorry.  Count Four.

6          THE COURT:  Count Four?

7          MS. COLLINS:  Yes.

8          THE COURT:  Okay.  Yeah.  I will have to take your

9   word for it.  I don't remember.

10          MS. COLLINS:  And then the other place was in --

11          THE COURT:  Are you asking me to go back and just

12   clarify that with them?

13          MS. COLLINS:  Yes, Your Honor.

14          THE COURT:  Okay.  That's fine.

15          MS. COLLINS:  And then the other place was in

16   Instruction No. 58.

17          THE COURT:  I got too much paper up here.

18          MS. COLLINS:  It's on page 67.

19          THE COURT:  All right.

20          MS. COLLINS:  So looking at the last paragraph of

21   page -- or, excuse me, Instruction 58, it says, If, however,

22   you are not satisfied as to the existence of any of these five

23   elements, then you may not find him guilty.

24          THE COURT:  I apologize.  Where are you?

25          MS. COLLINS:  Sorry.  On page 67, it's the last

```
 1  paragraph there.  Looking at the first sentence, it says, If,
 2  however, you are not satisfied as to the existence of any of
 3  these five elements, then you may not find the defendant
 4  guilty, and I think we heard you say "may" and just missed that
 5  second "not," which would be significant.
 6            THE COURT:  Okay.  Again, I will have to take your
 7  word for it.  I will correct both of those things.
 8            MS. COLLINS:  Thank you, Your Honor.
 9            THE COURT:  Anything else?
10            MR. OJO:  Your Honor, is that the information that's
11  on the -- the indictment?
12            THE COURT:  She's suggesting that in the
13  instructions, that as I was reading them, I just misspoke.  We
14  agreed to these instructions and I just missed a word.
15            MR. OJO:  So it doesn't say cocaine.  It says cocaine
16  base?
17            THE COURT:  I will confirm by checking the
18  indictment, but what it says here is cocaine base.
19            MR. OJO:  Okay.
20            THE COURT:  She is saying that I just said cocaine.
21            MR. OJO:  Okay.
22            THE COURT:  If I did do that, I should correct it.
23            MR. OJO:  Okay.
24            THE COURT:  But I will check that that's consistent
25  with the indictment as well.  All right.
```

1           MR. HALL:  Thank you, Your Honor.

2           THE COURT:  I said -- and I apologize because you

3    haven't had lunch now -- so how long are you going to be

4    because staff needs to have lunch, too?

5           MR. HALL:  Five minutes.

6           THE COURT:  Okay.  If you could just give them five

7    minutes to chat amongst themselves?  I appreciate that.

8    Thanks.

9           MR. HALL:  Thank you, Your Honor.

10          THE COURT:  I don't think you need the court reporter

11   for that purpose.  You can begin.  I am just going to get some

12   papers together as I leave.

13       (Recess taken from 1:22 p.m. until 3:19 p.m., at which

14   time a rearraignment was held and is filed separately on

15   CM/ECF.)

16                        - - - - -

17

18

19

20

21

22

23

24

25

1                    <u>INDEX TO TESTIMONY</u>

2

3     <u>DEFENDANT'S WITNESSES:</u>

4     <u>ALEXANDRA BILLETER</u>                              <u>PAGE</u>

5          Direct examination by Mr. Ojo              13
          Cross-examination by Ms. Hayes             35
6          Redirect examination by Mr. Ojo           68

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2            I, Renee A. Ewing, an Official Court Reporter for

3    the United States District Court for the District of Maryland,

4    do hereby certify that the foregoing is a true and correct

5    transcript of the stenographically reported proceedings taken

6    on the date and time previously stated in the above matter;

7    that the testimony of witnesses and statements of the parties

8    were correctly recorded in machine shorthand by me and

9    thereafter transcribed under my supervision with computer-aided

10   transcription to the best of my ability; and that I am neither

11   of counsel nor kin to any party in said action, nor interested

12   in the outcome thereof.

13

14
                    Renee A  Ewing
15
                    Renee A. Ewing, RPR, RMR, CRR
16                  Official Court Reporter
                    October 5, 2022
17

18

19

20

21

22

23

24

25